**Mark ORELSKI, Plaintiff,**

v.

**NCS PEARSON, Defendant.**

**No. C.A.03–371 ERIE.**

United States District Court,
W.D. Pennsylvania.

Sept. 27, 2004.

Jeff A. Connelly, Erie, OH, for Plaintiff.

Matthew W. McCullough, MacDonald, Illig, Jones & Britton, Erie, OH, for Defendant.

### ORDER

MCLAUGHLIN, District Judge.

On November 14, 2003, 2004, this matter was removed from the Erie County Court of Common Pleas. This matter was assigned to United States District Judge Sean J. McLaughlin and was referred to United States Magistrate Judge Susan Paradise Baxter for report and recommendation in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates.

By Report and Recommendation dated August 23, 2004, Magistrate Judge Baxter recommended that the motion to dismiss be granted. Document # 13.

Plaintiff filed Objections to the Report and Recommendation and Defendant filed a Response thereto.

THEREFORE, this _____ day of September, 2004;

Following a *de novo* review of the pleadings and record in this case,

IT IS HEREBY ORDERED that the Report and Recommendation by Magistrate Judge Baxter is adopted as the Opinion of this Court. The Clerk is directed to mark this case closed.

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

BAXTER, United States Magistrate Judge.

### I. RECOMMENDATION

It is respectfully recommended that the motion to dismiss [Document # 5] be granted.

## II. REPORT

### A. Procedural History

On May 30, 2003, Plaintiff Mark Orelski filed suit against Defendant NCS Pearson in the Court of Common Pleas of Erie County, Pennsylvania. The state court action presents the following three claims: Count I—misrepresentation; Count II—intentional infliction of emotional distress; and Count III—breach of contract. Plaintiff alleges that he suffered injury due to the misrepresentations and false assurances by Defendant, an independent contractor of the Transportation Security Administration ("TSA"), that his prior criminal history would not preclude him from employment by the TSA as an airport security screener.[1]

On November 14, 2003, Defendant NCS Pearson removed this matter from state court to this Court. The removal was based on diversity jurisdiction. Plaintiff did not oppose the removal by motion for remand.

On December 12, 2003, Defendant filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief may be granted. Specifically, Defendant argues that all of the state law claims of the present action are preempted by the Aviation Transportation Security Act and/or the Civil Service Reform Act and should be dismissed.

Plaintiff has filed an Opposition Brief. Document # 9. Defendant has filed a Reply to the Opposition, Document # 10 and Plaintiff has filed Supplemental Opposition Brief, Document # 11. Oral argument was held before this Court on July 16, 2004. This matter is ripe for disposition.

### B. The Standards of Review

#### 1. Federal Rule of Civil Procedure 12(b)(1)

When a motion to dismiss is made under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction which attacks the complaint as deficient on its face, the Court must take all allegations in the complaint as true. *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). However, when the motion attacks the existence of subject matter jurisdiction in fact, no presumptive truthfulness attaches to plaintiff's allegations and the Court may weigh the evidence to satisfy itself that subject matter jurisdiction exists in fact. *Id.* at 891. *See also Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3rd Cir.2000); *Poling v. K. Hovnanian Enterprises*, 99 F.Supp.2d 502, 515 (D.N.J.2000).

---

1. More specifically, the complaint alleges: A) Defendant was contracted by the TSA to assist with staffing positions with TSA, including approximately 80,000 airport security screener positions nationwide; B) Plaintiff applied for a federal TSA security screener position; C) for the purpose of determining whether he was disqualified from employment as a security screener, Plaintiff on several occasions disclosed to representatives of Defendant that he has been convicted of a crime involving misappropriation of postal funds, but was advised that his criminal record would not disqualify him from employment by TSA as an airport security screener; D) as a result of these representations, Plaintiff completed the application and assessment process, accepted a conditional offer of employment by TSA, completed mandatory classroom and on-the-job training and began performing security screening functions at the Erie airport while waiting to take a final exam; and E) on August 27, 2002, despite having been told that his criminal record would not disqualify him from employment, Plaintiff's employment was terminated by TSA due to the results of a criminal history record check which revealed that Plaintiff had been convicted of misappropriation of postal funds.

In *Mortensen,* the Third Circuit delineated the standard of review to be used in a 12(b)(1) motion, as opposed to a motion under 12(b)(6), stating:

The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. . . .

The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction its very power to hear the case there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

549 F.2d 884, 891. Accordingly, no presumptive truthfulness attaches to Plaintiff's allegations regarding subject matter jurisdiction.

### 2. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. *Neitzke v. Williams,* 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The motion cannot be granted unless the court is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. *Neitzke; Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. Therefore, in order to survive a motion to dismiss for failure to state a claim, the complaint must set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted.

### C. The Federal Preemption Doctrine

Defendant argues that this action should be dismissed because Plaintiff's claims arise under state law and are preempted by federal statute.

The Supremacy Clause of the U.S. Constitution provides that the laws of the United States shall be the supreme law of the land. U.S. Const., Art. VI, cl.2. The Supremacy Clause ensures that "the activities of the Federal Government are free

from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). The preemption doctrine does not only apply to state statutes and regulations: "[L]anguage preempting any law, rule, regulation, order or standard could include the preemption of state common law that covers the same subject matter." *Drake v. Laboratory Corp. of America Holdings*, 290 F.Supp.2d 352, 364 (E.D.N.Y.2003) (bold added), *citing CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

▪ Under the Supremacy Clause, there is a presumption in favor of preemption in fields that are inherently federal in character and that the states have not traditionally occupied. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). However, due to the Tenth Amendment, there is a presumption against preemption of fields traditionally governed by the states, which include common law torts; thus, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption," and "preemption will not lie unless it is the clear and manifest purpose of Congress." *CSX*, 507 U.S. at 664, 113 S.Ct. 1732.

▪ This Court's analysis must begin with determining Congressional intent: "Any understanding of the scope of a preemption statute must rest primarily on a fair understanding of *Congressional purpose*." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (italics in original). Congres-

sional purpose is discerned "from the language of the preemption statute and the statutory framework surrounding it." *Id.* at 486, 116 S.Ct. 2240. However, also relevant "is the structure and purpose of the statute as a whole as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* Congressional intent to preempt state law may be express or implied. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299–300, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

### D. Historical and Legislative Background

On September 11, 2001, nineteen men, now identified as foot soldiers of Osama Bin Laden's Al Queda network, hijacked four commercial airliners. Two of these airliners were crashed into the twin towers of the World Trade Center in New York City, resulting in its collapse. The third airplane was intentionally crashed into the Pentagon in Washington, D.C., while the fourth plane crashed in a rural area near Somerset, Pennsylvania, after several passengers overpowered the hijackers upon learning the fate of the other three planes. Thousands of people perished in these attacks.

In response to these terrorist attacks, Congress enacted the Aviation and Transportation Security Act, in order to *inter alia*, improve security at the nation's airports and to ensure the "safety and security of the civil air transport system." H.R. Rep. 107–296 at 53.[2] The ATSA made

---

**2.** A law review article describes the historical context of the ATSA:

In response to the clear and present danger of future terrorist attacks in the United States, (in addition to the measures immediately undertaken by the FAA), the Aviation and Transportation Security Act

(ATSA) was signed into law on November 16, 2001.

Congress passed the ATSA to bolster what many perceived as past security complacency. Prior to September 11, airlines and passengers were mostly concerned with on-time arrivals and departures. Airlines sel-

airport security a direct federal responsibility, created the TSA and mandated the Under Secretary of Transportation for Security ("Under Secretary") to assume complete responsibility for federal security screening operations at the nation's commercial airports. The ATSA further required that TSA develop standards for the hiring and training of airport security screening personnel according to legislative requirements, and mandated TSA to hire, train and deploy a sufficient number of federal security screeners to conduct screening of all passengers and baggage at commercial airports. Pub.L. No. 107–71, Title I, §§ 101, 110, 115 Stat. At 597–598, 615–616, 49 U.S.C. § 114 and 49 U.S.C. § 44901 and Note. Congress further gave the Under Secretary unfettered discretion with regard to the hiring, and terms and conditions of employment of security screeners as follows:

> *Notwithstanding any other provision of law,* the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate and fix the compensation, terms, and conditions of employment of Federal Service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under section 44901 of Title 49, United States Code. The Under Secretary shall establish levels of compensation and other benefits for individuals so employed.

Pub.L.No. 107–71, Title I, § 111(d), 115 Stat. 620, 49 U.S.C. § 44935 Note (italics added).

Congress imposed a deadline of one year from the date of enactment, or by November 19, 2002, by which TSA was to deploy a sufficient number of Federal screeners, Federal Security Managers, Federal security personnel and Federal law enforcement officers at all designated airports in the United States. Pub.L. No. 107–71, Title I, § 110(c), 115 Stat. At 616, 49 U.S.C. § 44901 and Note. Congress authorized the Under Secretary "to acquire services, including personnel services as the Under Secretary determines necessary...." Pub.L. No. 107–71, Title I, § 101(j)(1)(D), 115 Stat. at 599–600, 49 U.S.C. § 114(j)(1)(D). Additionally, Congress gave the Under Secretary expansive

---

dom searched checked baggage, and people passed with alarming frequency through security checkpoints with undetected weapons and false identification. Passengers boarded flights without paying much attention to the people sitting next to them. Most passengers tended to their own interests, tuning out those around them as well as safety instructions from flight attendants. Their concerns upon landing were only of waiting for luggage, ground transportation, and hotel reservations.

After September 11, this complacency disappeared. For many months, armed military personnel roamed airports, Security guards, fellow passengers, and flight crews scrutinized everyone. In one instance, a pilot removed an Arab–American man from a plane for allegedly suspicious conduct; the man happened to be a plain-clothes Secret Service agent.

The ATSA responds to this change in atmosphere and broadly expands the government's control over, and active role in, aviation security. The Act establishes hands-on, full-time federal control over aviation security through the creation of the Transportation Security Administration. Under the Act, the President appoints an Undersecretary responsible for an administrative agency overseeing security in all modes of transportation, including air travel.

A principal edict of the ATSA is the implementation of day-to-day screening operations of passenger air transportation and the hiring and training of a national force of security personnel, as well as the development of hiring and training standards for that force.

Kent C. Krause, *Putting the Transportation Security Administration in Historical Context,* 68 J. Air L. & Comm. 233, 243–44, Spring 2003.

authority including, with respect to per-sonnel and services, authority to enter into such contracts as may be necessary to carry out the functions of the TSA.

To assist in the assessment and referral of thousands of applications, TSA hired Defendant NCS Pearson, a private contractor, to support TSA in the development, implementation and execution of a staffing system for federal airport security screeners. NCS Pearson's performance of its contract to assist TSA was subject to strict requirements imposed by the ATSA and TSA regulations. Congress, through the ATSA, mandated TSA to establish a program for the hiring and training of security screening personnel, and directed TSA to establish qualification standards for individuals to be hired as security screening personnel consistent with minimum qualification standards set forth in the ATSA. Pub.L. No. 107–71, Title I, § 111(a), (e), 115 Stat. at 616–617, 49 U.S.C. § 44935(a), (e). TSA, through its contractor, NCS Pearson, issued vacancy announcements for potential screeners which outlined the application process, minimum position qualifications, conditions of employment and the various duties for the new Federal security screening positions for both passenger and baggage screeners.[3]

### E. The Preemption doctrine as applied to the ATSA

As the Aviation and Transportation Security Act is a relatively new law, enacted November 19, 2001, there is a dearth of legal authority on the question of whether it preempts state law claims.[45] See Kent C. Krause, *Putting the Transportation Security Administration in Historical Context,* 68 J. Air L. & Comm. 233, 250, Spring 2003 ("To date [Spring 2003], there are no reported interpretations by the courts of the authority granted to this new [TSA] administration."). After examining the Congressional intent against the historical backdrop of the tragic events of September 11, 2001, this Court is persuaded that the ATSA does preempt the state law claims of this action.

Prior to the September 11, 2001 terrorist attacks, civil aviation security functions

---

**3.** Applicants who successfully completed the assessment and who received conditional appointments as TSA security screeners were subjected to a thorough background investigation while the employee underwent classroom and on the job training. The background investigation included a fingerprint based criminal history record check, credit check, local agency check of arrests and convictions, verification of education and employment, check of personal references, and a national agency check. Defendant did not perform the background investigations on security screener candidates as TSA contracted separately with ChoicePoint to perform background screening.

**4.** In *American Federation of Government Employees v. Loy,* 281 F.Supp.2d 59 (D.D.C. 2003), the Union representing federal government employees brought suit against the Under Secretary of Transportation for Security, James M. Loy, contending that a determina-tion by Loy that TSA airport screeners would not be entitled to engage in collective bargaining ("the Loy Determination") violated the screener's constitutional rights and seeking a judgment declaring that Loy did not have statutory authority to issue that determination. The district court upheld the Loy Determination concluding, *inter alia,* that Loy acted within the express authority granted by Congress in section 111(d) of ATSA to determine, "notwithstanding any other provision of law," the terms and conditions of employment of federally-employed airport screeners, 281 F.Supp.2d at 62, 64–65. The decision of the district court was affirmed on appeal by the D.C. Circuit. *American Federation of Government Employees v. Loy,* 367 F.3d 932 (D.C.Cir.2004).

**5.** *See infra Tucker v. Ridge,* at 742–43 (E.D.Tex.2004) (holding that ATSA preempts the federal Rehabilitation Act).

were the responsibility of the Federal Aviation Administration (FAA) and the individual aircraft carriers. The creation of the Aviation and Transportation Security Act was Congress' initial response to the terrorist-related airline hijackings of September 11, 2001. By creating the new Transportation Security Agency, Congress intended to completely change the way in which airport screening and security were conducted.

The Aviation and Transportation Security Act does not include a statement of findings or purpose, but the House Conference Report contains the following statement:

> The Conferees recognize that the safety and security of the civil air transportation system is critical to the security of the United States and its national defense, and that a safe and secure United States civil air transportation system is essential to the basic freedom of America to move in intrastate, interstate and international transportation. The Conferees further note that the terrorist hijacking and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, *required a fundamental change in the way it approaches the task of ensuring the safety and security of the civil air transportation system.*

*The Conferees expect that security functions at United States airports should become a Federal government responsibility,* and it is their belief that while the number of Federal air marshals is classified, their presence would have a deterrent effect on hijacking and would further bolster public confidence in the safety of air travel. The Conferees also noted that the effectiveness of existing security measures, including employee background checks and passenger pre-screening, is currently impaired because of the inaccessibility of, or the failure to share information among, data bases maintained by different Federal and international agencies for criminal behavior or pertinent intelligence information. *The Conferees developed this legislation to address the security of the nation's transportation system.*

H.R. Conf. Rep. 107–296 at 53–54 (italics added).

The ATSA made airport security a direct federal responsibility, created the TSA and mandated the Under Secretary of Transportation for Security ("Under Secretary") to assume complete responsibility for federal security screening operations at the nation's commercial airports.[6] Under the ATSA, security screeners became employees of the U.S. government, as opposed to employees of private con-

---

6. Although not dispositive of Congressional intent, President George W. Bush described the ATSA during his signing of the legislation:

> Today, we take permanent and aggressive steps to improve the security of our airways. The events of September the 11th were a call to action. And the Congress has now responded.
>
>    *    *    *    *    *    *
>
> Now, we take the next important step. For the first time, airport security will become a direct federal responsibility. Overseen by a new Under Secretary of Transportation for Security. Additional funds will be provided

for federal air marshals. And a new team of federal security managers, supervisors, law enforcement officers and screeners will ensure all passengers and carry-on bags are inspected thoroughly and effectively. The new security force will be well-trained, made up of U.S. citizens. And if any of its members do not perform, the new Under Secretary will have full authority to discipline or remove them.

Remarks by the President at Signing of Aviation Security Legislation, Ronald Reagan National Airport, *at* http://www.whitehouse.gov/news/releases/2001/11/20011119–2.html.

tractors under contract to individual airlines.

Recently, a federal district court in Texas was presented with the question of whether the ATSA pre-empted another federal law, the Rehabilitation Act. *Tucker v. Ridge,* 322 F.Supp.2d 738, 742–43 (E.D.Tex.2004). In concluding that the Rehabilitation Act was preempted, the court examined the wording of the ATSA and held:

> When used by Congress, the word 'notwithstanding' overrides any specified, contrary provisions of law. *Shomberg v. United States,* 348 U.S. 540, 547–48, 75 S.Ct. 509, 99 L.Ed. 624 (1955); *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). When Congress states that a law will apply 'notwithstanding any provision of law,' the court must assume that Congress means what it says—namely, that the law applies even when it would violate otherwise applicable statutes.
>
> In reading the plain language of a statute, the cardinal principle of statutory construction is to save and not destroy. *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *accord TRW, Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). The duty of a court interpreting a statute is to give effect, if possible, to every clause and word of a statute. *Id.* For the court to allow Plaintiff to proceed with his Rehabilitation Act claim, the court would have to ignore the 'notwithstanding' clause of the ATSA. Because the court cannot ignore provisions of the ATSA, Tucker's claims fail as a matter of law.

*Tucker* at 742–43 (parallel citations omitted).

The *Tucker* court's interpretation of the "notwithstanding" clause of the ATSA is consistent with the Third Circuit's interpretation of the same clause in the contexts of different statutes. *See New Jersey Air Nat. Guard v. Federal Labor Relations Authority,* 677 F.2d 276, 283 (3d Cir.1982) (in construing a "Notwithstanding any other provision of law ..." clause, "[a] clearer statement is difficult to imagine: section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted."). *See also Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) ("As we have noted previously in construing statutes, the use of such a "notwithstanding" clause clearly signals the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section.").

Plaintiff argues that the preemption doctrine does not apply to this Defendant because NCS Pearson is an independent contractor—in other words, the doctrine applies only to the TSA because applying the preemption doctrine to a third party independent contractor effectively immunizes it from tortious behavior. This Court disagrees. To subject Defendant to differing standards of conduct and potential liability under fifty different sets of state laws for its performance of its federal contract (to hire 80,000 new federal employees) would effectively give states the power to dictate and review the manner in which these federal employees were recruited, assessed and hired, and thus would frustrate the Congressional objectives. This is precisely the situation which Congress sought to eliminate by the enactment of the ATSA.

Even in the instant case, assuming state law causes of action were not preempted by the ATSA, it is not readily apparent which state law would apply. The initial contact between Plaintiff and Defendant occurred over the telephone when Defen-

dant invited Plaintiff to an assessment event in Maryland, the initial electronic assessment was conducted in Ohio, and the underlying employment at issue occurred in Pennsylvania. Surely, Congress did not intend such a complicated legal landscape when it enacted the ATSA in response to the events of September 11, 2001.

Given the historical backdrop against which Congress enacted the ATSA in November of 2001, as well as the express language of the statute itself, this Court recommends a finding that the ATSA preempts the state law claims of the instant action. Accordingly, the motion to dismiss should be granted and the complaint should be dismissed.

## III. CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the motion to dismiss [Document # 5] be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

August 23, 2004.