Thomas E. SPRINGS, II, Plaintiff,

v.

David M. STONE, in his Official capacity as Acting Administrator, Transportation Security Administration, U.S. Department of Homeland Security, Defendant.[1]

No. CIV.A.2:04CV216.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 31, 2005.

1. The original named defendant in this case was James M. Loy. The Court has been advised that David M. Stone was appointed Acting Administrator of TSA in December 2003. Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Administrator Stone is **ORDERED** substituted as Defendant in this case.

Thomas Francis Hennessy, Norfolk, VA, for Plaintiff.

Lawrence Richard Leonard, United States Attorney's Office, Norfolk, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

DOUMAR, District Judge.

Plaintiff brought suit alleging that he was unlawfully terminated from his posi-

tion as a lead security screener with the Transportation Security Administration at the Norfolk International Airport in Norfolk, Virginia. He contends that his termination violated various provisions of the Aviation and Transportation Security Act, the Veterans' Preference Act of 1944, the Administrative Procedure Act, and the United States Constitution. Defendant has filed a Motion to Dismiss or, in the Alternative, a Motion for Summary Judgment. For the reasons that follow, Defendant's Motion is **GRANTED** and Plaintiff's claims are **DISMISSED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Reduction in Force by the Transportation Security Administration

On September 11, 2001, terrorists breached this Nation's civil air transportation system. Masquerading as civilian air travelers, they carried box cutter knives aboard commercial airplanes without detection by airport security. They used the knives to hijack four commercial planes, three of which they managed to convert into guided missiles to attack New York City and Washington, D.C.

Two months later, on November 19, 2001, Congress enacted the Aviation and Transportation Security Act ("ATSA"), Pub.L. No. 107–71, 115 Stat. 597 (2001), *as codified in* 49 U.S.C. § 114 *et. seq.,* a legislative initiative designed to strengthen national security through the federalization of the civil transportation system. *See* H.R. Conf. Rep. No. 107–296, at 53 (2001). The cornerstone of the ATSA is the creation of the Transportation Security Administration ("TSA"), a federal agency charged with overseeing every aspect of civil transportation security in this coun-

try. *See* § 101, 49 U.S.C. § 114. The most essential aspect of civil transportation security addressed by the ATSA, and for which TSA is accountable, is improving airport security to prevent a reprise of the tragic events of September 11, 2001. *See id.; see also* H.R. Conf. Rep. No. 107–296, at 55. To that end, Congress directed TSA to recruit, employ, and train a sufficient number of federal airport security screeners to screen every passenger and all property aboard airplanes departing from United States airports within one year of the ATSA's passage. ATSA § 110(c)(1), 49 U.S.C. § 44901 note. The ATSA's legislative history, structure, and purpose are discussed in greater detail below. *See infra* Part II.B.

To satisfy the airport security screening benchmarks established by the new law, TSA launched a "dynamic, high-pressure roll-out" of federally employed airport screeners in airports throughout the country. Pl.'s Mot. to Dismiss, Exh. 1, Decl. of Richard A. Whitford ("Whitford Decl.") ¶ 6.[2] The TSA contracted a human resource services provider to aid in employee recruitment, which between March and November 2002 processed 2,198,505 on-line applications and assessed some 340,000 eligible candidates for screening positions. *Id.* ¶¶ 3–4. This resulted in the hiring of more than 62,000 screening personnel by TSA between April and December 2002. *Id.* ¶ 5. As a consequence of what must have been either haphazard or ill-planned deployment of personnel, approximately 400 airports were equipped with security screening staffs that were either too large so as to be unwieldy, or too small so as to be inadequate. *Id.* ¶ 8; *see also* Pl.'s Mot. to Dismiss, Tab A to Exh. 1, Memorandum from Administrator Loy to TSA Screeners,

---

**2.** At the time he swore out the declaration cited extensively in this Memorandum Opinion and Order, Richard A. Whitford was TSA's Assistant Administrator for Human Re-

sources. Whitford Decl. ¶ 1. He also served as a co-chair of the Guidance Team that oversaw TSA's reduction in force. *Id.* ¶ 11

April 30, 2003 ("Loy Memorandum"); TSA Press Release (May 30, 2003) ("Press Release"), *quoted in* Pl.'s Compl. ¶ 17, *available at* http://www.tsa.gov/public/display?theme=44 & content=090005198002b7cb (last viewed March 30, 2005).

TSA therefore undertook to "right-size" the screener workforce in early 2003. *Id.* at ¶ 8. Simultaneous to the right-sizing efforts, TSA was informed that it had to reduce its screening workforce by approximately ten percent due to budget constraints. *Id.* at ¶ 9; *see also* Loy Memorandum. To achieve the necessary reorganization and reduction, TSA formed a Screener Workforce Right–Sizing Team ("SWRT") and an accompanying Guidance Team to oversee its efforts. *Id.* ¶ 11. The Guidance Team developed a two-phase plan for right-sizing and reduction, hereinafter referred to as the "reduction in force" ("RIF").[3] *Id.* ¶ 12. Phase I aimed to reduce the screening workforce by 3,000 personnel by the end of May 2003. *Id.* at ¶ 9; *see also* Loy Memorandum. Phase II aimed to achieve an equal reduction by the end of September. *Id.*

According to TSA, involuntary dismissal would only be utilized during either phase of the RIF in the event that normal employee attrition, transfers, and conversions to part-time status did not achieve the necessary results. *Id.* at ¶¶ 14–17; 33. It was apparent to the Guidance Team, however, that the necessary staff reduction could not be achieved through these measures alone. *Id.* ¶ 18. Furthermore, the Guidance Team concluded that a seniority-based approach, as well as other reduction techniques based on factors other than merit alone, were not feasible due to how recently staff for the newly formed TSA

had been hired. *Id.* ¶¶ 20–21. Thus, as most similarly situated organizations would do, TSA established competency-based criteria for implementing the RIF. *Id.* ¶¶ 18–22.

The Guidance Team concluded that a competency-based approach was particularly appropriate given "that the Screener position is critical to national security and requires highly skilled, highly trained employees ..." *Id.* ¶ 19. To implement the competency-based approach, the Guidance Team formed a Screener Competency-Based Reduction Team ("CBRT"), which developed a RIF plan "designed to retain the most skilled, highest performing Screeners to ensure the security and customer service required by the traveling public." *Id.* ¶ 19, 22. TSA described the approach in a press statement:

> Whenever possible, normal attrition, including resignations and retirements, is being used for rightsizing at individual airports. Employees may be terminated for cause, including criminal background, failure to pass drug and alcohol tests, and falsification of employment documents. Beyond that, the actual reductions in force are based on job performance.
>
> Qualified screeners at airports with too large a work force may seek transfers to airports needing screeners. A partial relocation stipend is available for screeners who transfer to certain airports. Screeners also have the opportunity to transfer from working full-time to working part-time, and TSA will soon start making such transfers.

Press Release, *see* citation *supra.*

The competency-based approach required that screeners take examinations

---

**3.** "A RIF is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abol- ished positions." *James v. Von Zemenszky,* 284 F.3d 1310, 1314 (Fed.Cir.2002) (citation omitted).

and participate in evaluations to measure performance and customer service. *Id.* at ¶¶ 19–25; *see also* Pl.'s Mot. to Dismiss, Tab D of Exh. 1, Screener Competency–Based Reduction Information Flyer ("Competency Flyer"). Specifically, the approach consisted of two examinations, an Image Proficiency Review ("IPR") measuring a screener's capacity to identify prohibited items on x-ray images of luggage, and a Standardized Proficiency Review ("SPR") measuring a screener's knowledge of standard operating procedures for screening. *Id.* ¶¶ 23–24; *see also* Competency Flyer. The competency-based review process also consisted of a conduct checklist designed to evaluate prior performance. *Id.* ¶ 25; *see also* Competency Flyer. Screening personnel were provided with a flyer describing the components of the competency-based review, explaining how the examinations would be scored, and providing advice on how to prepare. *See* Competency Flyer.

Due to time constraints, TSA relied only on the conduct checklist to complete Phase I of the RIF. *Id.* ¶ 25. The checklists were completed by management officials at overstaffed airports and forwarded to a Review Panel that did not include airport managers from the airports where the checklists were completed. *Id.* ¶ 26. The Review Panel apparently made final decisions about which employees would be terminated. *See id.* Approximately eight-hundred TSA employees were terminated via letters from TSA on May 23 and May 30, 2003. *Id.* ¶ 27. The necessary remaining reduction of 2,200 screening personnel was achieved by attrition. *Id.*

### B. Plaintiff's Employment with TSA

Among the eight-hundred airport screeners laid off in Phase I was Plaintiff Thomas E. Springs ("Springs"), who was an airport lead security screener at the Norfolk International Airport in Norfolk, Virginia from August 19, 2002 until his termination. Pl.'s Compl. ¶ 3. Springs' received a termination letter on May 30, 2003 indicating that his "separation [was] due to over staffing resulting from budget allocation and *[was] not for cause.*" Def.'s Opp. to Mot. to Dismiss, Aff. of Thomas E. Springs, II ("Springs Aff."), Exh. B (emphasis in original). The January prior to his termination, Springs had received a favorable evaluation of his work performance. Springs Aff., Exh. A.

During the course of his employment, Springs claims to have made a complaint concerning the hiring of a supervisor who was hired to fill a position for which Springs had an active application. Pl.'s Compl. ¶ 3; Springs Aff. ¶ 1. Springs claims to have been told that, as a current employee of TSA at the time he filed the application, he would be given preference over individuals who were not TSA employees. *Id.* The person eventually hired to fill the position, according to Springs, was not a TSA employee. *Id.*

Springs is a veteran of the United States Marine Corps, from which he received an honorable discharge after having served in Vietnam. Pl.'s Compl. ¶ 3; Springs Aff. ¶ 3. He subsequently served in the Marine Corp Reserves for twelve years. *Id.* The Notification of Personnel Action Springs received upon his termination indicates that he was entitled to a veterans' preference for the RIF. Springs Aff., Exh. C at parts 23 and 26. The Notification also indicates that Springs' tenure with TSA was "Conditional," as opposed to "Permanent" or "Indefinite." *Id.* at part 24.

### C. Procedural Posture

Springs initiated the present civil action on March 29, 2004, alleging that his termination violated various provisions of the ATSA, the Veterans' Preference Act of 1944, the Administrative Procedure Act, and the United States Constitution. Springs' Complaint contains five counts,

alleging the following: (1) that TSA's RIF standard violated the ATSA because it does not follow procedures for RIFs utilized by the Federal Aviation Administration ("FAA"); (2) that the RIF procedure violated the ATSA and the Veterans' Preference Act of 1944, Pub.L. No. 359, chp. 287, § 12, 58 Stat. 390, *as codified in* 5 U.S.C. § 3501 *et seq.*, because it did not give due consideration to tenure of employment, military status, length of service, and efficiency ranges; (3) that the RIF procedures constitute an arbitrary and capricious action by a federal agency in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706; (4) that TSA violated the ATSA by failing to deploy a sufficient number of federal screeners to conduct the screening of all passengers and property within the one-year deadline imposed by Congress; and, (5) that the RIF procedures violated Springs' due process and liberty interests under the Fifth Amendment to the United States Constitution because, though his separation letter states that he was not terminated for cause, TSA's public statements concerning the RIF damaged his professional reputation. *See* Pl.'s Compl. ¶¶ 25–35. Springs seeks a judgment declaring that TSA committed the aforementioned violations, prays for various forms of injunctive relief, including reinstatement and ordering TSA to take certain measures related to redressing the RIF, and requests damages in the form of backpay, benefits, and interest. *Id.* at 7–8. He also seeks reasonable attorney's fees and costs. *Id.* at 8.

Defendant filed the instant Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Motion") arguing that the Complaint fails to state a claim upon which relief can be granted for Counts One, Two, and Five, and that the

Court lacks subject matter jurisdiction over Counts Three and Four. The Court dispensed with oral argument because the facts and legal contentions are adequately presented in the memoranda submitted by the parties and oral argument would not aid in the decisional process. The Motion is therefore ripe for judicial resolution.

## II. ANALYSIS: MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Legal Standard

■ Defendant contends that Counts One, Two, and Five should be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint, *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989), and should be granted when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Harrison v. United States Postal Serv.,* 840 F.2d 1149, 1152 (4th Cir.1988). However, in the event that "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ..." Fed.R.Civ.P. 12(b). Both parties have submitted material outside the pleadings for consideration by the Court and have had ample opportunity to supplement their pleadings in support of their respective positions. *See Herbert v. Saffell,* 877 F.2d 267, 270 (4th Cir.1989). As a consequence, Rule 12 requires the Court to **CONVERT** Defendant's Motion to Dismiss Counts One, Two, and Five to a Motion for Summary Judgment.[4]

---

4. While Rule 12 requires conversion of the Motion, the heightened burden placed on

Springs by a motion for summary judgment

■ The standard for summary judgment is familiar and well-settled. It should only be granted if the moving party demonstrates that "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant so demonstrates, the burden of production, not persuasion, shifts to the non-moving party, *Celotex* at 477 U.S. at 322–23, 106 S.Ct. 2548, who must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(c)). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Unresolved facts are considered in the light most favorable to the non-moving party. *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

## B. Counts One and Two: FAA RIF Procedures and Veterans' Preference

Counts One and Two of Springs' Complaint alleges that TSA violated certain

provisions of the ATSA, §§ 101(n) and 111(f)(1)(D)(2), 49 U.S.C. §§ 114(n) and 44935(f)(1)(D)(2), and VPA, 5 U.S.C. §§ 3308–3320, when it designed and implemented the RIF. Defendant contends that a separate provision in the ATSA, § 111(d), 49 U.S.C. § 44935 note, exempts TSA from those requirements. Resolving this dispute requires an examination of the ATSA to determine its purpose and ascertain the scope of the provisions involved.

### 1. Purpose of the ATSA

Congress promulgated the ATSA in the wake of the September 11, 2001 terrorist attacks in New York and Washington, D.C, having determined that the "safety and security of the civil air transportation system is critical to the security of the United States and its national defense, and that a safe and secure United States civil air transportation system is essential to the basic opportunity of America to move in intrastate, interstate and international transportation." H.R. Conf. Rep. No. 107–296, at 53. Congress deemed it necessary to federalize the transportation security screening apparatus and undertake a "fundamental change in the way [the United States] approaches the task of ensuring the safety and security of the civil air transportation system." *Id.* At its core and all around its edges, the ATSA is a legislative initiative aimed a strengthening the security of this Nation's transportation infrastructure-the civil air transportation system in particular-and nothing else.[5]

---

under Rule 56 has no bearing on the resolution of Defendant's Motion with respect to Counts One, Two, and Five. For the reasons explained below, the law simply does not afford Springs relief for the claims pled in the Complaint, regardless of whether the applicable standard is that of Rule 12 or Rule 56.

**5.** For additional discussion of the purpose and historical context of the Aviation Transportation and Security Act, *see Orelski v. Pearson,* 337 F.Supp.2d 695, 699–701 (W.D.Pa. 2004) (McLaughlin, J.) (quoting at length Kent C. Krause, *Putting the Transportation Security Administration in Historical Context,* 68 J. Air. L. & Comm. 233 (Spring 2003)).

## 2. The Transportation Security Administration and Its Under Secretary

The ATSA established the Transportation Security Administration ("TSA"), an administration of the Department of Transportation charged with ensuring "security in all modes of transportation . . ." § 101(d), 49 U.S.C. § 114(d); *see also* H.R. Conf. Rep. No. 107–296, at 55, U.S.Code Cong. & Admin.News 2002, p. 589, ("[T]he best way to ensure effective Federal management of the nation's transportation system is through the creation of a new Administration within [the Department of Transportation] to be called the Transportation Security Administration (TSA). The TSA's responsibilities will encompass security in all modes of transportation."). The TSA is headed by an Under Secretary appointed to a five-year term by the President with the advice and consent of the Senate. *Id.* § 101(b), 49 U.S.C. § 114(b).[6] The fundamental mandate of the Under Secretary is to oversee and ensure the security of every form of civil transportation in the United States. With regard to the civil air transportation system, Congress explicitly requires that the Under Secretary "provide for the screening of *all* passengers and property . . . that will be carried aboard a passenger aircraft . . ." *Id.* § 110(a), 49 U.S.C. § 44901(a) (emphasis added). To that end, the Under Secretary was directed to deploy a "sufficient number of Federal screeners" to provide for screening of all passengers and property within one year of passage of the ATSA. § 110(c)(1), 49 U.S.C. § 44901 note. Additionally, aside from the towering mandate to outfit every airport in the United States with a sufficient number of security screeners, the ATSA also saddles the Under Secretary with manifold specific duties related to carrying out the mandate, including, but not limited to, the following:

(1) [to] be responsible for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation under [49 U.S.C. §§ ] 44901 and 44935;

(2) [to] develop standards for the hiring and retention of security screening personnel;

(3) [to] train and test security screening personnel; and

(4) [to] be responsible for hiring and training personnel to provide security screening at all airports in the United States where screening is required under [49 U.S.C. § ] 44901, in consultation with the Secretary of Transportation and the heads of other appropriate Federal agencies and departments.

ATSA § 101(e), 49 U.S.C. § 114(e).

Not only does the ATSA charge the Under Secretary with ensuring that all passengers and property on airplanes departing from the United States are screened, it further assigns him responsibility for actually staffing airports, training screeners, and ensuring that screeners do their jobs effectively. For all intents and purposes, the Under Secretary is largely responsible for preventing a repeat of the events of September 11, 2001. However, as will be explained below, while the TSA

---

6. In November 2002, Congress enacted the Homeland Security Act of 2002. Pub.L. 107–296, 116 Stat. 2135 (2002), *as codified in* 6 U.S.C. § 101 *et. seq.* The law created the Department of Homeland Security, which now encompasses TSA. Effective March 1, 2003, all TSA functions were transferred to the Directorate of Border and Transportation Security and the designated title for the head of TSA was changed from "Under Secretary" to "Administrator." *See Am. Fed'n of Gov't Employees, AFL–CIO v. James M. Loy,* 281 F.Supp.2d 59, 61 n. 1 (D.D.C.2003) (Collyer, J.). This Memorandum Opinion and Order refers to TSA's head as the "Under Secretary" in order to remain consistent with the statutory language contained in the ATSA, which remains unchanged.

Under Secretary is shouldered with expansive responsibilities and a daunting mandate, Congress accorded him with the robust authority it viewed as necessary to see them through.

### 3. The Relevant Statutory Provisions

Among the features of the ATSA is a provision establishing a personnel management system for employees of TSA. The law sets as the default personnel management system one that is identical to the system established by the administrator of the Federal Aviation Administration ("FAA"):

PERSONNEL MANAGEMENT SYSTEM—The personnel management system established by the Administrator of the Federal Aviation Administration under [49 U.S.C. § ] 40122 shall apply to employees of the Transportation Security Administration, or, subject to the requirements of such section, the Under Secretary may make such modifications to the personnel management system with respect to such employees as the Under Secretary considers appropriate, such as adopting aspects of other personnel systems of the Department of Transportation.

ATSA § 101(n), 49 U.S.C. § 114(n). This provision incorporates into the ATSA certain provisions of the VPA that are included in the FAA's personnel management system. See 49 U.S.C. § 40122(g)(2); 5 U.S.C. §§ 3308–3320. Springs argues that § 101(n) requires TSA to utilize the veterans' preference standards contained in 5 U.S.C. §§ 3308–3320 when designing and implementing a RIF. He further argues that the standards established by FAA for implementing a RIF, see FAA Order 3350.2 (Oct. 17, 1994), which necessarily include veterans' preferences, are also mandatory for TSA pursuant to this section.

The ATSA also sets forth standards for the selection, training, and employment of security screening personnel. Congress viewed the task of airport screening as so important that it outlined specific minimum qualifications to fill the positions. See ATSA § 111, 49 U.S.C. § 44935; see also Tucker v. Ridge, 322 F.Supp.2d 738, 740–42 (E.D.Tex.2004) (Schell, J.) (discussing some of the qualifications); Sharr v. Dep't of Transp., 247 F.Supp.2d 1208, 1210–12 (D.Or.2003) (Jones, J.) (describing the evaluation process that the first wave of applicants for screening positions underwent). Aside from the minimum qualifications, among the employment standards included in the ATSA and relevant to this case is a qualified hiring preference for veterans of the United States armed services:

VETERANS PREFERENCE—The Under Secretary shall provide a preference for the hiring of an individual as a security screener if the individual is a member or former member of the armed forces and if the individual is entitled, under statute, to retired, retirement, or retainer pay on account of service as a member of the armed forces.

§ 111(f)(1)(D)(2), 49 U.S.C. § 44935(f)(1)(D)(2). Springs contends that this provision also requires TSA to incorporate a preference for veterans into the RIF.

While it established the default personnel management system and outlined standards for employment, Congress also recognized that the Under Secretary must have "wide latitude to determine the terms and conditions of employment of screeners" in order to fulfill the Herculean mandate with which TSA and the Under Secretary are charged. H.R. Conf. Rep. No. 107–296, at 64. Accordingly, in addition to giving the Under Secretary discretion to make appropriate modifications to the default personnel management system, the

ATSA contains a catchall provision vesting broad discretion in the Under Secretary to take employment action with respect to airport screening personnel notwithstanding *any* other provision of law:

> SCREENER PERSONNEL.—*Notwithstanding any other provision of law,* the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under [49 U.S.C. § 44901]. . . .

§ 111(d), 49 U.S.C. § 44935 note (emphasis added).[7]

### 4. Merits of Defendant's Motion

█ The issue for decision is simply whether ATSA § 111(d), 49 U.S.C. § 44935 note, the notwithstanding clause, exempts the TSA Under Secretary from applying the ATSA's personnel management provision, § 101(n), 49 U.S.C. § 114(n), which incorporates provisions of the VPA, 5 U.S.C. §§ 3308–3320, and the veterans' preference provision, § 111(f)(1)(D)(2), 49 U.S.C. § 44935(f)(1)(D)(2), to employment decisions that affect airport security screeners. Settling the question is a matter of statutory interpretation, the first principle of which is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted). If, as is the case here, "the words of a statute are unambiguous, then, this first [principle] is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)).

█ ATSA § 111(d) is sweeping. A "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (collecting cases); *see also Shomberg v. United States,* 348 U.S. 540, 547–48, 75 S.Ct. 509, 99 L.Ed. 624 (1955) (explaining that by using "'notwithstanding' language . . . Congress clearly manifest[s] its intent that certain policies should override" other provisions in a statute). Congress could not have used language any clearer than it did in the ATSA to indicate the breadth of the Under Secretary's authority with respect to airport screeners. *Cf. Liberty Maritime Corp. v. United States,* 928 F.2d 413, 416 (D.C.Cir.1991) (noting that when Congress uses "notwithstanding" language, "[a] clearer statement of law is difficult to imagine [internal quotations omitted]").[8]

---

7. The fact that ATSA § 111(d) was attached as a statutory note to 49 U.S.C. § 44935, as opposed to being codified as an independent provision, does not limit its applicability. The laws of the United States are evidenced by the Statutes at Large, not by their placement within the United States Code. 1 U.S.C. § 112; *see also Conyers v. Merit Sys. Protection Bd.,* 388 F.3d 1380, 1382 n. 2 (Fed.Cir. 2004).

8. Both parties devote discussion in their memoranda to the implications of *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) on this case. Defendant contends that the TSA Under Secretary's interpretation of ATSA § 111(d) should be accorded *Chevron* deference. Plaintiff, obviously, argues otherwise. *Chevron* has no bearing on the resolution of this Motion for, as is explained in the text of the Memorandum Opinion and Order, "the intent of Congress is clear, [which] is the end of the matter; for the court, as well as the agency[ and the plaintiff,] must give effect to the unambiguously expressed intent of Congress." *Id.* at 842, 104 S.Ct. 2778.

The breadth of this clause cannot be overstated. Not only did Congress exempt the Under Secretary from specific employment constraints with respect to airport security screeners contained in the ATSA itself, it took the further step of relieving him from the constraints of "*any other provision of law.*" Thus, those provisions of law that would otherwise constrain the Under Secretary's discretion, including ATSA §§ 101(n) and 111(f) and the relevant provisions of the VPA, do not apply to employment action affecting airport security screeners. Courts interpreting § 111(d) have accorded it a sweeping breadth. *See Conyers v. Merit Sys. Protection Bd.*, 388 F.3d 1380, 1382 (Fed.Cir. 2004) (concluding that the ATSA § 111(d) "notwithstanding" clause "renders inapplicable general federal statutes that otherwise would apply to the Under Secretary's power to 'employ, appoint, discipline, terminate, and fix the compensation terms, and conditions of employment of Federal service' for screener positions"); *Tucker*, 322 F.Supp.2d at 743 (concluding same); *see also AFGE v. FLRA*, 46 F.3d 73, 76 (D.C.Cir.1995) (collecting cases where the statutory phrase "notwithstanding any other provision of law" was found to vest broad discretion in a federal agency); *cf. Nabozny v. NCS Pearson, Inc.*, 270 F.Supp.2d 1201, 1204 (D.Nev.2003) (Hunt, J.) (holding that the ATSA contains no civil remedies to enforce the veterans' preference provision in a case brought against a private contractor engaged by TSA to administer screening tests to applicants for employment as airport security screeners).

■ Springs argues that if § 111(d) does in fact exempt the Under Secretary from the constraints of "any *other* provision of law," it must not exempt the Under Secretary from provisions contained within the ATSA. Interpreting the statute to exempt the Under Secretary from the ATSA's own provisions, he contends, fails

to give effect to every component of the law and renders those portions exempted superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. [internal quotation marks omitted]."). To the contrary, "notwithstanding" language may be construed to override provisions contained in the same law. *See Liberty Maritime Corp.*, 928 F.2d at 416–17, n. 4. It matters not whether the conflicting provisions are in the same statute or a different one; a "notwithstanding" clause as broad as the one used here by Congress provides a blanket exemption. Indeed, "[h]ere, Congress has preempted 'any provision,' which means all statutory provisions." *Tucker*, 322 F.Supp.2d at 743. In any event, § 111(d) applies only to *airport security screeners*, not to all TSA employees. Therefore, it does not wholly negate other provisions contained in the ATSA, but rather exempts the Under Secretary from applying certain provisions to employment actions affecting airport security screeners in particular. Other constraints outlined in the ATSA, including §§ 114(n) and 111(f), as well those contained in other applicable federal laws, still apply to the Under Secretary's discretion when it comes to employment action concerning other employees of TSA.

To be clear, Congress' decision to "distinguish[ ] between airport screeners and other TSA personnel" was deliberate. *Am. Fed'n of Gov't Employees, AFL–CIO v. James M. Loy*, 281 F.Supp.2d 59, 65 (D.D.C.2003) (Collyer, J.), *affirmed*, 367 F.3d 932 (D.C.Cir.2004). Congress "was specifically concerned about ensuring that TSA have the right to hire and fire airport security screeners as needed according to

the demands and pressures of their jobs." *Id.* The "provision confers upon the Under Secretary greater flexibility regarding screener positions than he or she may have with respect to other classes of employees." *Conyers,* 388 F.3d at 1382; *see also Dept' of Homeland Sec. & Am. Fed'n of Gov't Employees, AFL–CIO,* WA–RP–03–0023 etc. (Decision and Order on Petetions, July 7, 2003) at 10–11, n. 21, *cited in Am. Fed'n of Gov't Employees,* 281 F.Supp.2d at 65 (" '[T]he majority has said time and again you cannot have Federal workers because it is too hard to fire them. It is too hard to move them around. So we give you the flexibility to write the rules the way you want to do it . . .' [citation omitted]."). That there is logic supporting such a distinction is apparent.

There is a rational basis for distinguishing, as Congress has done, between airport security screeners and other TSA employees. On this point, the statute represents a compromise of conflicting views with the single aim of providing heightened security through management flexibility. A different choice might have been made but Congress could rationally conclude that airport security requires federal employees who operate with more flexibility than either civil service or collectively-bargained protections and procedures would allow.

*Am. Fed'n of Gov't Employees,* 281 F.Supp.2d at 66. Congress distinguished between airport security screeners and other employees because they are, literally, the last line of defense to prevent terrorists from boarding airplanes with the tools necessary to carry out the type of attacks that occurred on September 11, 2001. When it passed the ATSA, Congress viewed security as paramount. Vesting the Under Secretary with complete authority over the hiring *and* firing of airport security screeners, as it did in ATSA § 111(d), is a reflection of that view. Other provisions of the ATSA reflect that

view as well. *See, e.g.,* ATSA § 110(b), 49 U.S.C. § 44901(b) (requiring that all screening personnel be supervised by an officer of TSA "who shall have the power to order the dismissal of any individual performing such screening"); *id.* § 111(i), 49 U.S.C. § 44935(i) (prohibiting employment strikes by airport screening personnel).

■ Finally, Springs contends that the power to design and implement a RIF is not part of the "termination" power given to the Under Secretary under § 111(d), and thus the provision does not apply to this case at all. This is plainly incorrect. In support of his argument, Springs relies on *James v. Von Zemenszky,* 284 F.3d 1310 (Fed.Cir.2002), a case involving a federal agency vested with the power to prescribe "conditions of employment" "notwithstanding any law." In *James,* the Federal Circuit held that the term "conditions in employment" does not encompass "staffing adjustments" that resulted in termination of employment. *Id.* at 1317. As a result, the court concluded that, despite the notwithstanding clause, the agency was required to follow statutorily-prescribed procedures for implementing a RIF. *Id.* Unlike the provision examined in *James,* §§ 111(d) of the ATSA explicitly empowers the Under Secretary to "terminate" any screener, "notwithstanding any other provision of law." This language clearly *does* encompass RIFs, which necessarily result in employee terminations.

When all is said and done, if "Congress states that a law will apply 'notwithstanding *any* provision of law' the court must assume that Congress means what it says—namely, that the law applies even when it would violate otherwise applicable statutes," *Tucker,* 322 F.Supp.2d at 743, or, for that matter, even other provisions contained in the same law. As a conse-

quence, Counts One and Two are **DIS-MISSED**.

### C. Count Five: Fifth Amendment Violation

Count Five of Springs' Complaint alleges that the RIF procedures violated Springs' due process rights under the Fifth Amendment to the United States Constitution. He alleges that "Defendant has advertised through its press releases [that] it selected employees for the RIF based on prior disciplinary incidents or for poor job performance." Pl.'s Compl. ¶ 34; *see* citation for Press Release *supra* Part I.A. He contends that his "professional reputation has [consequently] been damaged" because the public is left to believe that those employees terminated as part of the RIF were not worthwhile to keep. Springs Aff. ¶ 4.

The first step in determining whether due process applies at all is to identify "the nature of the interest at stake." *Bd. of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). A liberty interest is involved "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him ..." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Indeed, the Due Process Clause is implicated by the termination of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community." *Roth,* 408 U.S. at 573, 92 S.Ct. 2701. For a statement to rise to such a

level, it must, at a minimum, "imply the existence of serious character defects such as dishonesty or immorality." *Robertson v. Rogers,* 679 F.2d 1090, 1092 (4th Cir. 1982); *see also Roth,* 408 U.S. at 573, 92 S.Ct. 2701; *Zepp v. Rehrmann,* 79 F.3d 381, 387 (4th Cir.1996).[9]

The May 30, 2003 TSA Press Release, which Springs alleges offends a liberty interest protected by due process, *see* Pl.'s Compl. ¶ 17, explained that the number of airport security screeners would be reduced through attrition, job performance, and by termination for cause, including criminal background, failure to pass drug and alcohol tests, and falsification of employment documents. The Press Release does not mention Springs by name, nor does it mention Norfolk International Airport, where he was employed. Construing all the facts alleged in the Complaint, as well as those contained in the Springs Affidavit, in the light most favorable to Springs, the worst that a person aware of Springs' termination as part of the RIF could believe is that he was terminated due to poor job performance.

As a matter of law, a statement indicating that a person was terminated due to poor job performance does not implicate a constitutionally protected liberty interest. *See Robertson,* 679 F.2d at 1092 ("[A]llegations of incompetence do not imply the existence of serious character defects such as dishonesty or immorality ... and are not the sort of accusations that require a hearing."). In *Robertson,* the United States Court of Appeals for the Fourth Circuit held that a statement by a superintendent that an assistant was ter-

---

**9.** The cases cited in this section were decided in the context of actions against state employers for violation of the Fourteenth Amendment due process right. The same analysis applies to the Fifth Amendment protections. *See United States v. Balsys,* 524 U.S. 666, 700, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (Ste-

vens, J., concurring) ("Th[e] [Fifth Amendment] constrains the power of the Federal Government to deprive any person 'of life, liberty, or property, without due process of law,' just as the Fourteenth Amendment imposes comparable constraints on the power of the States.")

minated for "incompetence and outside activities" does not give rise to a protected liberty interest. *Id.* at 1092. Similarly, in *Zepp* the Fourth Circuit concluded that a *televised* statement made by a county executive, which stated that the plaintiff was being "*forced* to retire" from his position at a county detention center "due to management problems" also did not implicate a protected liberty interest. 79 F.3d at 388.

■■■ In this case, the allegedly stigmatizing statement comes from a general press statement that applies to 6,000 employees. It does not mention Springs by name. It does not make any reference to Norfolk International Airport. Furthermore, it contains mitigating statements that make it abundantly clear that the RIF was being carried out primarily to right-size the workforce, and not in an attempt to ferret out incompetence or to achieve some other goal:

> Staffing levels for individual airports were based on an initial assessment of how many full-and part-time screeners were needed. Those assessments are being adjusted as the assessment model is refined and as federal security directors at the airports justify changes in the assigned staffing levels. That process is expected to continue through the summer as TSA determines how best to deploy screener resources. As a result airports that have reached preferred levels remain subject to change sin full-or part-time staffing.

*See* citation for Press Release *supra* Part I.A.

Nothing about the Press Release "seriously damage[s Springs'] standing and associations in his community." *Roth,* 408 U.S. at 573, 92 S.Ct. 2701. In no way does it suggest that any of the terminated workers, nor Springs in particular, was "guilty of dishonesty, or immorality." *Id.* Springs' allegation that TSA violated his Fifth Amendment right to due process is unfounded. Accordingly, Count Five is **DISMISSED.**

## III. ANALYSIS: SUBJECT MATTER JURISDICTION

### A. Legal Standard

■■■ Defendant contends that Counts Three and Four of the Complaint should be dismissed for want of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Federal courts are "obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v. Edwards,* 190 F.3d 648, 654 (4th Cir.1999). This obligation " 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.' " *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)). "It is elementary that the burden is on the party asserting jurisdiction[, in this case, as in most, the plaintiff,] to demonstrate that jurisdiction does, in fact, exist." *Id.* Unlike a motion to dismiss under Rule 12(b)(6), *see supra* Part II.A, "when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion ..., the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia,* 370 F.3d 392, 398 (4th Cir. 2004).

### B. Count Three: The Administrative Procedure Act

■■■ Count Three of Springs' Complaint alleges that the RIF standard utilized by TSA was an arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA"), 5

U.S.C. § 706. The APA permits federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This provision does not constitute an independent basis for subject matter jurisdiction to review any and all actions taken by a federal agency, but rather sets forth the scope of review applicable to agency actions for which an independent basis of subject matter jurisdiction does exist. *See Califano v. Sanders,* 430 U.S. 99, 104–07, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) ("[N]either the text nor the history of the APA speaks in favor of such a reading, and ... Congress ... appears not to have envisioned the APA as playing any such stopgap role."); *Invention Submission Corp. v. Rogan,* 357 F.3d 452, 459 (4th Cir.2004) (quoting *Hearst Radio, Inc. v. FCC,* 167 F.2d 225, 227 (D.C.Cir.1948)) ("[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency ..."). To avoid dismissal for want of subject matter jurisdiction, Springs bears the burden of identifying an independent ground under which this Court is empowered to review the RIF standards employed by TSA.

■ Springs contends that the RIF is reviewable as an "agency action" under the APA, which is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also id.* § 551(4) (defining the term "rule"). The mere fact that a federal agency's conduct constitutes "agency action" under the APA does not make it reviewable. The APA only grants a right of review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute ..." *Id.* § 702. Even so, such review is only available when the agency action complained of is "made reviewable by statute" or constitutes "final agency action for which there is no other adequate remedy in a court ..." *Id.* § 704; *see also Darby v. Cisneros,* 509 U.S. 137, 146, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("Although [§ 702] provides the general right to judicial review of agency actions under the APA, [§ 704] establishes when such review is available."). Indeed, "[t]he elimination of the defense of sovereign immunity [under § 702] did not affect any other limitation on judicial review that would otherwise apply under the APA." *Darby,* 509 U.S. at 153, 113 S.Ct. 2539.

As Defendant correctly points out, the APA itself contains one such limitation, which exempts from judicial review any "agency action [that is] committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Presumably, though his memorandum does not make it entirely clear, Springs' position is that the RIF is a final agency action, which would render it subject to review. Defendant counters that the ATSA grants TSA discretion to design and implement a RIF, which, regardless of whether it is a final agency action, would exempt the RIF from judicial review under § 701(a)(2) of the APA. Thus, whether this Court may exercise subject matter jurisdiction over Springs' claim depends on whether the RIF constitutes an "agency action [that is] committed to agency discretion by law."

■ In deciding whether an action falls within a federal agency's discretion, courts "begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). It is therefore only appropriate to invoke the exception to judicial review contained

in § 701(a)(2) in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There is no law to apply if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In such an instance, the agency's discretion is absolute; there is no review for abuse of discretion. *See id.* ("[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.' "); *see also Inova Alexandria Hosp. v. Shalala,* 244 F.3d 342, 346 (4th Cir.2001) (setting forth the same standard of review as above).

Since the burden for proving subject matter jurisdiction rests continuously with the party seeking to invoke it, Springs must point to some meaningful standard by which this Court may determine whether TSA's actions were arbitrary and capricious with respect to the standards used to implement the RIF. The only argument he proffers in support of subject matter jurisdiction is the strong presumption that administrative actions are reviewable. Even that strong presumption is insufficient in the face of overwhelming evidence that Congress intended to vest broad discretion in TSA and the Under Secretary to make independent employment decisions affecting airport security screeners. *See* discussion *supra* Part II.B. What is more, there are no readily identifiable standards by which to evaluate the alleged arbitrariness and capriciousness of the RIF. This case represents one of those rare instances when judicial review is precluded.

The RIF implemented by TSA is part and parcel of the "termination" power vested in the Under Secretary under ATSA § 111(d). 49 U.S.C. § 44935 note. As outlined above, § 111(d) provides that "the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for" airport security screeners, "notwithstanding any other provision of law." *Id.* Such language explicitly authorizes the exercise of broad discretion not constrained by the judicial review provisions contained in the APA. *See* discussion *supra* Part II.B.

Furthermore, the ATSA offers no guidance on how TSA should implement a RIF. Springs contends that FAA RIF policies derived from FAA orders and the Code of Federal Regulations should control. However, the sweeping nature of ATSA § 111(d) exempts the TSA from adhering to the FAA RIF procedures, *see supra* Part II.B, and the ATSA itself contains no provisions directing TSA how to implement RIFs against which this Court could scrutinize TSA's conduct. In addition, ATSA § 101(n), 49 U.S.C. § 114(n), grants the Under Secretary the authority to make appropriate modifications to the FAA personnel management system, the default system put in place by Congress. There is simply nothing to which this Court could turn to evaluate whether the RIF standards developed by TSA were arbitrary or capricious. The reason for this is apparent: Congress left airport security screening personnel decisions to the Under Secretary's discretion.

The ATSA is a legislative initiative concerned with enhancing the security of our Homeland. Imposing multiple layers of review on the employment decisions of the TSA Under Secretary undermines that concern and the clearly expressed will of

Congress. The only hook on which Springs can hang subject matter jurisdiction for his APA claim would undue the new airport security scheme established by the ATSA. Accordingly, Count Three of the Complaint is **DISMISSED**.

### C. Count Four: A Sufficient Number of Federal Screeners

Count Four of Springs' Complaint alleges that TSA violated the ATSA by failing to deploy a sufficient number of federal screeners to conduct the screening of all passengers and property within the one-year deadline imposed by Congress. The ATSA provision at issue requires the following:

> Not later than 1 year after the date of enactment of this Act, the Under Secretary of Transportation for Security shall deploy at all airports in the United States where screening is required under [49 U.S.C. § 44901] a sufficient number of Federal screeners, Federal Security Managers, Federal security personnel, and Federal law enforcement officers to conduct the screening of all passengers and property under section 44901 of such title at such airports.

§ 110(c)(1), 49 U.S.C. § 44901 note. Defendant argues that Springs lacks prudential standing to challenge TSA's compliance with ATSA § 110(c)(1) because he is not within the zone of interests that Congress intended to protect when it enacted the provision. Springs retorts that airport screening personnel are arguably within the scope of interests safeguarded by § 110(c)(1), which is sufficient to establish standing.

■■■ Though standing and subject matter jurisdiction are technically independent doctrines, Defendant's plea that Springs lacks standing to challenge TSA's compliance with ATSA § 110(c)(1) is properly brought pursuant to Rule 12(b)(1). *See Citizens for a Better Env't*, 523 U.S. at

104, 118 S.Ct. 1003 (resolving a challenge to standing on appeal from a dismissal pursuant to Rule 12(b)); *Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir.2003) (resolving a challenge to plaintiff's standing pursuant to a Rule 12(b)(1) motion); *Skrizowski v. United States*, 292 F.Supp.2d 277 (D.N.H.2003) (Muirhead, USMJ) (same). The question of standing is a threshold issue of jurisdiction, which Springs bears the affirmative burden of satisfying. *Citizens for a Better Env't*, 523 U.S. at 102, 104, 118 S.Ct. 1003.

■■■ The constitutional minimum requirements for standing under Article III involve the familiar "triad of injury in fact, causation, and redressability . . ." *Id.* at 103, 118 S.Ct. 1003. Additionally, "[a]part from Article III jurisdictional questions, problems of standing, as resolved by this Court for its own governance, have involved a rule of self-restraint." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). This rule of self-restraint, generally imposed in cases involving challenges to the statutory authority of federal agencies under the APA, expands the constitutional triad to " 'involve[ ] both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The prudential limitations, under which Defendants challenge Springs' standing to bring Count Four, are " 'founded in concern about the proper-and properly limited-role of the courts in a democratic society.' " *Id.* (quoting *Warth*, 422 U.S. at 498, 95 S.Ct. 2197). To satisfy the prudential inquiry, a court must be satisfied that the plaintiff's claim "arguably fall[s] within the zone of interests protected or regulated by the statutory provision

... invoked in the suit." *Id.; see also, e.g., Data Processing,* 397 U.S. at 153, 90 S.Ct. 827; *Taubman Realty Group,* 320 F.3d at 480; *Pye v. United States,* 269 F.3d 459, 466–67, 469–70 (4th Cir.2001).

The prudential inquiry starts with an examination of "Congress's intent in enacting [the relevant statute] in order to determine whether [the plaintiff was] meant to be within the zone of interests protected by [the] statute." *Air Courier Conf. v. Am. Postal Workers Union,* 498 U.S. 517, 523–24, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991). The central issue for determination is whether "[t]he plaintiff's interests are so marginally related to or inconsistent with the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Assoc.,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Courts should settle the inquiry "not by reference to the overall purpose of the statute in question but, instead, by reference to the particular provision(s) of law upon which the plaintiff seeks redress." *Taubman Realty Group,* 320 F.3d at 480 (quotation omitted). However, courts "may consider any provision that helps ... to understand Congress' overall purposes in the ... Act." *Clarke,* 479 U.S. at 401, 107 S.Ct. 750.

Springs maintains that his interest in employment with TSA is "arguably" the type of interest sought to be protected by ATSA § 110(c)(1). There is no support for this assertion. The ATSA was not promulgated in order to protect the employment interests of federal screeners, but instead to addresses national security and passenger safety. *See* discussion *supra* Part II.B. Security was Congress's paramount concern. Section 110(c)(1) underpins that concern by setting a firm deadline for the complete federalization of the airport security screening system. A mere modicum of common sense reveals that the purpose of § 110(c)(1) was to ensure that a sufficient airport security apparatus was put in place as soon as possible, and not to extend any form of civil relief in the event that the benchmark was not attained. *See Air Courier Conf.,* 498 U.S. at 525–26, 111 S.Ct. 913 (finding no standing for postal employees union to challenge statute ending Post Office's monopoly where ending the monopoly would endanger their jobs because statute "indicate[s] that the congressional concern was not with opportunities for postal workers but with the receipt of necessary revenues for the Postal Service"); *Taubman Realty Group,* 320 F.3d at 481 (affirming dismissal under Rule 12(b)(1) where statute was designed to improve the interstate highway system, not protect the property rights of nearby commercial property owners). Accordingly, Count Four is **DISMISSED**.

## IV. CONCLUSION AND ORDER

The ATSA is not an employee security bill—it is a national security bill. Protections extended to employees in other federal agencies simply do not apply to airport security screeners employed by TSA, who, quite literally, represent the last line of defense against terrorists seeking to turn our own civil air transportation system against us. It is understandable that airport security screeners are concerned with their jobs; but when Congress passed the ATSA, it was concerned with Homeland security, not job security.

For the foregoing reasons, Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment is **GRANTED**, subject to these specifications:

1) David M. Stone is **ORDERED** substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1);

2) With respect to Counts One, Two, and Five, Defendant's Motion to Dismiss

for failure to state a claim upon which relief can be granted is **CONVERTED** to a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 12(b);

3) Counts One, Two, and Five are **DISMISSED** pursuant to Federal Rules of Civil Procedure 12(b) and 56(c);

4) Counts Three and Four of the Complaint are **DISMISSED** for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

The Clerk of the Court is **DIRECTED** to close this case and provide a copy of this Memorandum Opinion and Order to counsel of record for both parties via United States mail.

**IT IS SO ORDERED.**