INVENTION SUBMISSION CORPO-RATION, a Pennsylvania Corporation, Plaintiff–Appellant,

v.

James E. ROGAN, Under Secretary of Commerce for Intellectual Property and Director, United States Patent and Trademark Office, U.S. Department of Commerce, in his official capacity, Defendant–Appellee.

No. 02–2461.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 30, 2003.

Decided: Feb. 11, 2004.

nia, for Appellant. Rachel Celia Ballow, Assistant United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** J. Stephen Purcupile, Carolyn M. Corry, Friedman & Friedman, Pittsburgh, Pennsylvania; Richard C. Sullivan, Jr., Reed Smith, L.L.P., Falls Church, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINS, Chief Judge, and NIEMEYER and SHEDD, Circuit Judges.

Vacated and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge WILKINS and Judge SHEDD joined.

## OPINION

NIEMEYER, Circuit Judge:

Invention Submission Corporation commenced this action under the Administrative Procedure Act ("APA") against James E. Rogan in his official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("PTO"), alleging that the PTO's 2002 advertising campaign to alert the public about "invention promotion scams" was aimed at Invention Submission to penalize it and ultimately put it out of business. Invention Submission alleged that the advertising campaign was an illegal final agency action that was arbitrary and capricious and exceeded any statutory authority conferred on the PTO.

On the PTO's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), based on the ground that the PTO advertising campaign was not a "final agency action" and therefore that the district court lacked subject matter jurisdiction, the district court dismissed the action. *See Invention Submission Corp. v. Rogan,* 229 F.Supp.2d 498

(E.D.Va.2002). The district court, however, acted under Federal Rule of Civil Procedure 12(b)(6), concluding that "under any set of facts that could be proved consistent with the [complaint's] allegations," no relief could be granted to Invention Submission.

Reviewing the district court's order *de novo,* we agree that the complaint must be dismissed, but not under Rule 12(b)(6). As we explain below, we conclude that because the PTO's advertising campaign was not a final agency action—a conclusion that the district court also reached in its opinion—the district court had no subject matter jurisdiction to review it. *See* 5 U.S.C. § 704. We must therefore vacate the district court's order of October 30, 2002, as well as the supporting opinion, and remand with instructions to dismiss Invention Submission's complaint for lack of subject matter jurisdiction.

I

Congress enacted the Inventors' Rights Act of 1999, 35 U.S.C. § 297, to protect inventors from invention promotion scams and the deceptive advertising related to them by authorizing the PTO to publicize complaints that it receives against invention promoters. *See* 145 Cong. Rec. S14521 (Nov. 10, 1999). The Act and the regulations adopted under it impose a duty on the PTO "to provide a forum for the publication of complaints concerning invention promoters." 37 C.F.R. § 4.1; *see also* 35 U.S.C. § 297(d). The Act and regulations do not, however, authorize the PTO to conduct any independent investigations of invention promoters, authorizing instead enforcement by injured persons through civil actions. *See* 35 U.S.C. § 297(b), (d); 37 C.F.R. § 4.1.

In connection with its duty to publicize complaints concerning invention promoters, the PTO initiated an advertising cam-

paign in January 2002 to alert the public to "invention promotion scams," and its advertisements stated, "Make sure your ideas—and your money—don't wash away. To learn more, call the U.S. Patent and Trademark Office toll-free." In launching the media campaign, the PTO stated in a press release:

> This week, the United States Patent and Trademark office (USPTO) unveils a television and radio campaign in five media markets to counter the flood of deceptive advertising aimed at America's independent inventors.... The Agency also will be placing print ads....
>
> "USPTO's ads caution inventors that 'if it sounds too good to be true, it is,'" said James E. Rogan, Under Secretary of Commerce for Intellectual Property. "Our ads offer practical information, guiding inventors to USPTO's Office of Independent Inventor Programs, where they can get real help with patenting and marketing their inventions."
>
> Every year invention promotion scams cost U.S. inventors an estimated $200 million. The spots feature an actual inventor, Edward Lewis, who lost several thousand dollars.

In the print advertising published by the PTO, Edward Lewis is quoted as saying, "I spent $13,000 and three years 'spinning my wheels' with a company that promised my idea would make lots of money. They were right. It made lots of money ... *for them.* I haven't seen a penny."

A journalist for a cable television network, who saw the PTO's advertising campaign, contacted the PTO and requested contact information for Lewis. After the PTO provided the information, the cable television network interviewed Lewis and published a story that revealed that, in the PTO-published quotation of Lewis, Lewis was referring to his relationship with Invention Submission Corporation, an invention promoter. The article revealed that Lewis had filed a complaint with the PTO in August 2001 that was "being processed." The article also revealed that Invention Submission was one of several companies investigated by the FTC in the 1990s "for misrepresentation in patent marketing schemes." It stated that in 1994, "without admitting or denying guilt, the company agreed to pay a $1.2 million settlement for refunds in the case, as well as change its business practices." The article included Invention Submission's response to Lewis' accusations that "it did nothing wrong, that neither its representatives nor commercials misled Lewis or any other inventor."

Edward Lewis, from Sicklerville, New Jersey, who invented "BodyGuard" to "shield automobile paint while tough wheel-cleaning products do their work," had indeed filed a complaint with the PTO against Invention Submission on August 1, 2001, and the PTO sent a copy of the complaint for response to Invention Submission on March 1, 2002. Sometime before March 26, 2002, Invention Submission and Lewis resolved Lewis' complaint, and, on that date, Lewis withdrew his complaint from the PTO. Accordingly, Invention Submission advised the PTO that it was not submitting a response to the complaint, and the PTO did not post Lewis' complaint on the agency's web site.

A few months after Lewis withdrew his complaint from the PTO, Invention Submission commenced this action against the PTO under the APA, alleging that because the PTO was authorized only to receive customer complaints, provide invention promoters with notice and reasonable opportunity to respond, and provide a forum to publicize complaints and responses, the PTO exceeded its authority in publicizing Lewis' complaint in its media advertising and illegally used the public media to sin-

gle out Invention Submission to penalize it. As it alleged:

[T]he PTO intentionally publicized ISC [Invention Submission] as the invention company which was the subject of the Lewis complaint, for the purpose of stigmatizing ISC.

\* \* \*

The PTO knew that, if the Lewis complaint was not withdrawn, and was subsequently made publicly available on the PTO's web site under the [Inventors' Rights Act], ISC would be further identified with the PTO's unfair and untrue television and print advertisements, and an additional link would be established between ISC and the PTO's statements about "scams" and false promises of money to Lewis.

\* \* \*

The PTO thereby knowingly violated the [Inventors' Rights Act's] requirement that it make the Lewis complaint publicly available only in a neutral forum, without comment or judgment, together with ISC's response.

In addition, Invention Submission's complaint alleged that John Calvert, the Acting Director of the Office of Independent Inventor Programs at the PTO, "demonstrated [an] animus of the PTO against ISC when he stated an intention to solicit and investigate customer complaints despite the PTO's lack of authority to do this." Invention Submission's complaint described a meeting of inventors at which Calvert was alleged to have said:

The only way that we do not post it [a customer complaint] is if you withdraw it, and we have one company that Bob ... and I were talking about that has a tendency to settle quickly ... but we're going to get them up there yet. We got to find somebody that doesn't want to settle and get their name on our Inter-

net, on the Internet site, and we will have them up eventually. We have one up there now, and you can look at it.

The complaint concluded with allegations that in pursuing these actions directed against Invention Submission, the PTO "has taken final agency actions in the nature of imposing sanctions and/or failing to act in accordance with the [Inventors' Rights Act] and the regulations," and therefore, under the APA, the actions were "arbitrary, capricious, an abuse of discretion[,] ... contrary to constitutional right[,] in excess of statutory jurisdiction, authority, or short of statutory right." Invention Submission sought declaratory and injunctive relief, as well as attorneys fees.

The PTO filed a motion to dismiss Invention Submission's complaint for lack of subject matter jurisdiction, asserting that the federal courts could review only "final agency actions" and that the PTO's alleged conduct did not qualify as a final agency action. The district court granted the PTO's motion, but it did so under Federal Rule of Civil Procedure 12(b)(6). The court assumed the facts of the complaint to be true and concluded that "it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations." The court ruled first that because it was Lewis, not the PTO, who identified Invention Submission, it could only be speculation that the PTO was referring to Invention Submission by quoting Lewis in the advertising. Focusing on Calvert's statements, the district court observed that they were merely consistent with the congressional intent behind passage of the Inventors' Rights Act that "invention promotion scams harm individual inventors and ought to be eliminated." In addition, the court concluded that such statements could not be considered agency action. The district court also found that any harm sustained by Invention Submission was indirect because it was not based di-

rectly upon what the PTO included in its advertising campaign. Therefore, the court concluded, "The PTO's publications in this case were merely generic advertisements of agency programs not specifically naming the plaintiff. Any harm to the plaintiff was, at most, indirect." Finally, the district court rejected the plaintiff's contention that PTO violated its own regulations by using the media to enforce a private complaint. It concluded:

> Even if plaintiff could demonstrate that the defendant violated agency regulations, an agency's failure to follow its own regulations is only actionable under the APA if it results in a final agency action. A violation of agency regulations alone, absent some harm to the plaintiff, is not reviewable. As discussed above, plaintiff has not alleged any specific harm caused by the defendant's actions.

Accordingly, the district court entered an order dated October 30, 2002, dismissing the complaint "with prejudice."

This appeal followed.

## II

■ Invention Submission contends that PTO's advertising campaign was both false and unauthorized, targeting Invention Submission in order to penalize it and put it out of business. It argues that the Inventors' Rights Act of 1999 granted the PTO only limited authority to create a forum to publish complaints and responses to them and that the PTO's 2002 advertising campaign directed at Invention Submission went beyond this stated authorization. Therefore, it asserts that the campaign was illegal agency action. Invention Submission relies heavily on *Industrial Safety Equipment Association, Inc. v. EPA,* 837 F.2d 1115 (D.C.Cir.1988), to justify court review of this agency conduct under the APA.*7

In *Industrial Safety,* the D.C. Circuit held that an agency's publication of a report evaluating respirators for their effectiveness in protecting against asbestos exposure was not an "agency action," as used in the APA, that was reviewable in court, even though the report recommended against using several respirators that had already been certified for use. Observing that its own precedent in *Hearst Radio, Inc. v. FCC,* 167 F.2d 225 (D.C.Cir.1948) (holding that "agency action," including its component term "sanction," does not include an agency's publication of a report,

---

* In its brief, Invention Submission also seeks to justify the federal court's jurisdiction on its general equity jurisdiction to review unlawful actions of officials of an administrative agency, under the *"McAnnulty* Doctrine," citing *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), and a plurality opinion in *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

Invention Submission did not, however, bring this action against the PTO under the *"McAnnulty* Doctrine," but rather relied exclusively onthe APA. In addition, it did not present this theory to the district court. In its brief, it argues that its reliance in the district court on *Industrial Safety* was the same as reliance on the *"McAnnulty* Doctrine," and because it relied on *Industrial Safety* before the district court, it therefore was, by implication, relying on the *"McAnnulty* Doctrine." But this syllogism mischaracterizes *Industrial Safety.* The court in *Industrial Safety* did not discuss the *"McAnnulty* Doctrine," a doctrine of equity jurisdiction apart from the APA, but rather was construing the APA itself. The discussion in *Industrial Safety* on which Invention Submission relied related to whether an agency's penalizing a party through adverse publicity was a "sanction" as defined by 5 U.S.C. § 551(10), which in turn was included as a component of "agency action," defined in § 551(13).

For these reasons, we do not address whether the *"McAnnulty* Doctrine," which Invention Submission raises for the first time on appeal, provides a basis for judicial review of unlawful agency action.

even if the report is false and amounts to libel causing actual damage), might be too restrictive, the D.C. Circuit explained that *Hearst Radio* created a problem because it failed "to ... protect[ ] parties from false or unauthorized agency news releases." 837 F.2d at 1118. Inasmuch as the APA's definition of "agency action" includes agency sanctions, adverse publicity might be a "sanction" and therefore an agency action in certain circumstances:

> Thus, though adverse impact alone would not necessarily make agency publicity reviewable as a sanction, an agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action. This conclusion would be especially compelling if an information release caused "destruction ... of property," or "revocation ... of a license."

*Id.* at 1119 (quoting 5 U.S.C. § 551(10)) (citation omitted). The court found no facts in the record before it to justify an exploration of the interpretation that adverse publicity *might* amount to a sanction, and it concluded that the agency's publication of the asbestos respirator report was not an agency action under any other component of the APA definition that would make it reviewable by a court. *Id.*

Invention Submission's argument that the district court had jurisdiction thus rests on its advancement of an interpretation of "agency action" that would include—through the "sanction" component of the definition of agency action—false or unauthorized advertising aimed at the plaintiff. *See* 5 U.S.C. §§ 551(10), 551(13).

The PTO argues that our recent decision in *Flue Cured Tobacco Cooperative Stabilization Corp. v. EPA,* 313 F.3d 852 (4th Cir.2002), which does not construe "agency action" so broadly as might be indicated by *Industrial Safety,* controls the outcome of this case. In *Flue–Cured Tobacco,* we held that publication of an EPA report that classified environmental tobacco smoke as a potentially harmful human carcinogen was not an agency action reviewable under the APA, even though the report was allegedly arbitrary and capricious and created harm to the plaintiff. The PTO argues that even though Invention Submission was displeased with the advertising campaign, it cannot challenge the campaign in the courts because the campaign at most produced only "coercive pressures on third parties" and did not signal the "consummation of the agency's decision-making process so as to 'give rise to legal consequences, rights, or obligations.'" Addressing Invention Submission's reliance on *Industrial Safety,* the PTO argues that the D.C. Circuit's statements in that case were only posited as potential holdings and were no more than dicta. In addition, the PTO argues that our decision in *Flue–Cured Tobacco* followed the D.C. Circuit's decision in *Hearst Radio,* which the *Industrial Safety* decision criticized but did not overrule. For these reasons, the PTO contends that *Industrial Safety* is hardly persuasive precedent in this circuit.

Thus, the issue presented is whether the PTO's advertising campaign, allegedly aimed at Invention Submission to penalize it, constituted final agency action under the APA so as to be reviewable in court. *See* 5 U.S.C. §§ 702, 704. As a question of subject matter jurisdiction, *see Flue–Cured Tobacco,* 313 F.3d at 857, we must address this issue before evaluating Invention Submission's complaint for whether it states a claim upon which relief can be granted, *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), although these questions are close to one another in circumstances such as are presented in this case, *see Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,*

341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

■ Section 704 of the APA provides that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." *Id.* § 551(13). Although each of the constituent elements of "agency action" are in turn defined in § 551, at bottom, a final agency action as used in § 704 must be the "consummation of the agency's decisionmaking process ... [and] must be [an action] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted); *Flue–Cured Tobacco,* 313 F.3d at 858. In *Flue–Cured Tobacco,* we explained that the persuasive value of agency reports or publications did not create a reviewable agency action under the APA because such reports or publications in themselves did not "create any rights, obligations, or consequences." 313 F.3d at 860. As we summarized it:

> We do not think that Congress intended to create private rights of actions to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published. Such policy statements are properly challenged through the political process and not the courts.

*Id.* at 861. Those principles govern the disposition of this case.

In this case, the advertising material published by the PTO under the Inventors' Rights Act did not name or single out Invention Submission or any other invention promoter. The advertisements were facially neutral, aimed at all invention promotion scams—scams that the advertise-ments asserted were causing the public to lose $200 million each year. While the advertising did include a quotation from "Edward Lewis, Inventor," it quoted his experience with an unidentified company. Lewis is quoted as saying that "I spent $13,000 and three years 'spinning my wheels' with *a company* that promised my idea would make lots of money." (Emphasis added).

Invention Submission argues that the advertising campaign linked Invention Submission with Lewis because a journalist was able to interview Lewis and obtain the details of his experiences with Invention Submission and because the PTO made that possible by providing the journalist with Lewis' telephone number. Whether a third person could obtain sufficient information to link the two, however, does not taint the otherwise nonspecific advertising. The PTO did not publish any material that linked Lewis with Invention Submission, and it did not post Lewis' complaint on its web site.

■ "[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency," *Hearst Radio,* 167 F.2d at 227, and the PTO's advertising campaign, including its conduct in giving a journalist Lewis' telephone number, is not the type of conduct that constitutes agency action that is reviewable in court under the APA. Other than the administrative decision to conduct an advertising campaign at all—a decision that Invention Submission has not challenged—the content of the campaign was not the consummation of any decisionmaking process that determined rights or obligations or from which legal consequences flowed. *See Bennett,* 520 U.S. at 178, 117 S.Ct. 1154; *Flue–Cured Tobacco,* 313 F.3d at 858. Moreover, by looking at the campaign material, the public would see only that a consumer complained about

an invention promoter and that invention promotion scams are causing the public $200 million in losses every year. Surely Invention Submission would not suggest that the attribution in the advertisements of $200 million in losses to patent scams was in any respect focusing the public's eye on it. The text of the advertising material can only be construed to be an effort by the PTO to inform inventors of the perils and potential scams that they might encounter during the patent process. Such advertising did not create "legal consequences" for Invention Submission or any other member of the public cognizable as final agency action, and the campaign itself did not determine any right or obligation of any party.

■ While Invention Submission points to the adverse effect it suffered as a result of the campaign, that effect was based on the fact that a journalist linked Invention Submission with Lewis, and such an indirect impact does not transform the agency's conduct into final agency action under the APA. *See Flue–Cured Tobacco,* 313 F.3d at 860. If the PTO's advertising made business more difficult for Invention Submission by raising the public's awareness, the decisions of members of the public "are attributable to independent responses and choices of third parties" and cannot be imputed to the PTO for purposes of determining whether its conduct was a final agency action. *See id.* at 861.

■ Invention Submission argues that the advertising must not be considered only facially but also in light of the intent of PTO officials whose purpose was more clearly focused on Invention Submission. Such underlying intent of agency officials, however, does not convert the PTO's legal advertising material warning generally of invention promotion scams—the purpose for which Congress enacted the Inventors' Rights Act—into a PTO sanction imposed on Invention Submission that would be

reviewable in court, especially when the material itself does not reference an intent to penalize any particular company. The measure of the advertising campaign must be made by the information conveyed by it to the public. As we have noted, the effect of the PTO's campaign so measured was not a regulatory effect reviewable in court, but at most an indirect effect from third parties and market forces.

In short, the PTO's advertising campaign warning the public about invention promotion scams was consistent with the PTO's commission granted by the Inventors' Rights Act of 1999, and in the circumstances of this case, the decision to pursue such a campaign, as well as its content, did not create a final agency action that is reviewable in court. As we said in *Flue–Cured Tobacco,* this type of a campaign is "properly challenged through the political process and not the courts." 313 F.3d at 861.

### III

Because the conduct of the PTO that is the subject of this action did not constitute "final agency action" as used under the APA, the district court did not have subject matter jurisdiction to evaluate the complaint under Rule 12(b)(6) and should have dismissed this case under Rule 12(b)(1). We therefore vacate its order of October 30, 2002, as well as the supporting opinion, and remand with instructions to dismiss this case under Federal Rule of Civil Procedure 12(b)(1).

*VACATED AND REMANDED WITH INSTRUCTIONS*