**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1699**

THE CITY OF NEW YORK; THE CITY OF PHILADELPHIA; THE CITY AND COUNTY OF SAN FRANCISCO,

        Plaintiffs – Appellants,

    v.

THE UNITED STATES DEPARTMENT OF DEFENSE; THE UNITED STATES DEPARTMENT OF THE AIR FORCE; THE UNITED STATES DEPARTMENT OF THE NAVY; THE UNITED STATES DEPARTMENT OF THE ARMY; JAMES N. MATTIS, in his official capacity as United States Secretary of Defense; HEATHER A. WILSON, in her official capacity as United States Secretary of the Air Force; RICHARD V. SPENCER, in his official capacity as United States Secretary of the Navy; DR. MARK T. ESPER, in his official capacity as United States Secretary of the Army; DERMOT F. O'REILLY, in his official capacity as Director of the Defense Criminal Investigative Service; COLONEL KIRK B. STABLER, in his official capacity as Commander of the Air Force Office of Special Investigations; ANDREW L. TRAVER, in his official capacity as Director of the Naval Criminal Investigative Service; MAJOR GENERAL DAVID P. GLASER, in his official capacity as Commanding General of the United States Army Criminal Investigation Command; REAR ADMIRAL JOHN B. NOWELL, in his official capacity as Commander of the Navy Personnel Command and Deputy Chief of Naval Personnel,

        Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:17-cv-01464-CMH-MSN)

Argued: December 11, 2018                 Decided: January 16, 2019

Before WILKINSON, AGEE, and THACKER, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Thacker joined.

———————

**ARGUED:** Matthew Jeffrey MacLean, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., for Appellants. Tyce R. Walters, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Laura B. LoBue, Jeetander Dulani, Washington, D.C., Kenneth W. Taber, Matthew F. Putorti, Nicholas M. Buell, PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, New York, for Appellants. Eric Proshansky, Melanie C.T. Ash, Eric Lee, Claude S. Platton, Zachary W. Carter, CORPORATION COUNSEL OF THE CITY OF NEW YORK, NEW YORK CITY LAW DEPARTMENT, New York, New York, for Appellant City of New York. Dennis J. Herrera, Yvonne R. Mere, Owen J. Clements, SAN FRANCISCO CITY ATTORNEY'S OFFICE, San Francisco, California, for Appellant City and County of San Francisco. Marcel S. Pratt, Eleanor N. Ewing, Benjamin H. Field, CITY OF PHILADELPHIA LAW DEPARTMENT, Philadelphia, Pennsylvania, for Appellant City of Philadelphia. Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Michael J. Fucci, Associate General Counsel, UNITED STATES DEPARTMENT OF DEFENSE, Washington, D.C., for Appellees.

———————

WILKINSON, Circuit Judge:

Appellants are three municipalities who use the National Instant Criminal Background Check System to carry out their obligations under state law. This system, known as the NICS, is managed by the Federal Bureau of Investigation. The Department of Defense (DOD) is required under federal law to provide records to the NICS but has persistently been unable to fully carry out this obligation. The appellants sued DOD and its constituent military departments to compel the department's more thorough compliance. The district court dismissed their claim, holding both that the appellants lacked constitutional standing and failed to establish subject matter jurisdiction under the Administrative Procedure Act. For the following reasons, we affirm.

I.

A.

The responsibility to combat gun violence falls on every level of government. Law enforcement officials, whether local, state, or federal, work to prevent senseless gun violence and are often the first to risk their lives to protect our communities. Working alongside these officers are many other governmental partners, including agencies of the federal government. The dispute here grows out of a program that facilitates information sharing between federal agencies and local law enforcement officials: The National Instant Criminal Background Check System.

The Brady Handgun Violence Prevention Act, or Brady Act, established the first nationwide system for background checks. Pub. L. No. 103-159, 107 Stat. 1536 (1993).

3

Under the law, enacted in 1993, a background check was required for firearms sales by licensed dealers. *Id.* § 102. The Brady Act directed the Attorney General to establish a national database that would be accessible to the firearms dealers tasked with ensuring these background checks were performed. *Id.* § 102(b). To implement the statute, the Attorney General established the National Instant Criminal Background Check System (NICS) and delegated control of the system to the Federal Bureau of Investigation (FBI).

The NICS contains records for individuals who are prohibited from possessing a firearm. The system draws from many distinct federal databases that contain disqualifying records and relies on information submitted from across the federal government. In the military context, DOD provides information regarding current and former service members who are disqualified from owning a gun because of a prior conviction. The Brady Act also empowers the Attorney General to request records from other agencies that may possess disqualifying information. *Id.* § 103(e) (codified at 34 U.S.C. § 40901(e) (2018)).

As originally designed, state law enforcement agencies were required to administer the Brady Act's background checks on a temporary basis while the new national background check system was established. The division of responsibility envisioned by Congress was altered by the Supreme Court's decision in *Printz v. United States*, which found that "[t]he Federal Government may [not] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." 521 U.S. 898, 935 (1997). As the law now stands, states are not required to perform any functions associated with the Brady Act, although a state may

4

voluntarily play a role. For states that elect to participate, a "point of contact" is designated to "serv[e] as the intermediary between [a dealer] and the federal databases checked by the NICS." 28 C.F.R. § 25.2 (2017).

This does not mean that state and local governments have no use of the information stored in the NICS. To the contrary, many states require law enforcement agencies to carry out a range of functions designed to prevent guns from reaching dangerous hands. Depending on the particulars of state law, a local law enforcement agency may perform checks associated with issuing permits and licenses, or may review disqualifying information before transferring a gun that is in the state's possession. For example, the City of Philadelphia, a party to this case, is required to process applications for licenses to carry firearms under Pennsylvania law. *See* 18 Pa. Cons. Stat. § 6109. The other municipal appellants have similar obligations.

The Attorney General has long permitted state and local agencies, including the appellants, to access the NICS for these purposes. In 1998, the FBI promulgated a rule allowing state and local law enforcement to use the NICS when "issu[ing] a firearm-related or explosives-related permit or license," including concealed-carry permits. *See* National Instant Criminal Background Check System Regulation, 63 Fed. Reg. 58,303, 58,309 (Oct. 30, 1998) (codified at 28 C.F.R. § 25.6(j)(1)). In 2014, a new rule further expanded NICS access, allowing state and local agencies to access the system when disposing of firearms in their possession. *See* National Instant Criminal Background Check System Regulation, 79 Fed. Reg. 69,047, 69,048 (Nov. 20, 2014) (codified at 28 C.F.R. § 25.6(j)(3)). The regulations clearly state that these uses of the NICS are

5

permissive, intended as a service, and "unrelated to NICS background checks required by the Brady Act." 28 C.F.R. § 25.6(j).

At times, local law enforcement officials have pushed for even greater access. For instance, the FBI's 1998 rulemaking noted that some local agencies wanted permission to access the database to determine if a person was in "unlawful possession of a firearm." 63 Fed. Reg. at 58,305. The FBI resisted these requests. In the FBI's view, such expanded use would potentially run afoul of federal privacy laws. *Id.* Moreover, the FBI noted that the Brady Act only required agency reporting for the purpose of carrying out the federal background check provisions, rather than for a wider range of law enforcement activities. *Id.* The permissive use regulations therefore account for the requirements of federal law, the informational needs of local law enforcement, and the privacy concerns of the affected individuals. In arriving at the scheme in place today, the FBI has shown a willingness to expand NICS access to support local partners, but has apparently not gone as far as some of those partners may desire.

The comprehensiveness and accuracy of the NICS has been a subject of frequent debate and attention. *See, e.g.*, U.S. Gov't Accountability Office, GAO/T-GGD-00-163, Gun Control: Improving the National Instant Criminal Background Check System (June 21, 2000). At the federal level, many agencies possess disqualifying information that would be relevant to a background check. Under the original Brady Act, federal agencies were required to furnish information to the Attorney General upon request. *See* Pub. L. No. 103-159, § 103(e)(1) (1993) (codified as amended at 34 U.S.C. § 40901(e)(1)).

6

Following the fatal shooting of 32 students and faculty at Virginia Tech in 2007, Congress enacted new legislation to improve the NICS. *See* NICS Improvement Amendments Act of 2007 (NIAA), Pub. L. No. 110-180, 121 Stat. 2559 (2008). Finding that "nearly 21,000,000 criminal records are not accessible by NICS and millions of criminal records are missing critical data, such as arrest dispositions, due to backlogs," the legislation imposed new reporting requirements and authorized new grants to assist states. *Id.* §§ 101, 103-104. To improve inter-agency information sharing, the Act imposed an affirmative duty on agencies to report disqualifying information on a quarterly basis. *Id.* § 101(a) (codified at 34 U.S.C. § 40901(e)(1)(C)-(D)). To incentivize compliance, the Attorney General is required to provide an annual report to Congress on each agency's success. *Id.* (codified at 34 U.S.C. § 40901(e)(1)(E)).

The Department of Defense (DOD) has long struggled to comply with the NIAA's affirmative reporting provision, a deficiency the department readily admits. Response Br. at 1. The DOD Inspector General reviewed the program in 2015 and found that a substantial percentage of required records were not being submitted to the FBI. U.S. Dep't of Def. Inspector Gen., Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements 9 (Feb. 12, 2015). Similar findings were made again in 2017. U.S. Dep't of Def. Inspector Gen., Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations (Dec. 4, 2017). On November 5, 2017, a gunman opened fire at a church in Sutherland Springs, Texas, killing 26 people and injuring an additional 20. The gunman was a former member of the military who had been convicted in court-martial

7

proceedings. According to the municipal appellants, the gunman would not have been able to obtain a firearm if DOD complied with its reporting obligations under the NIAA.

Following the devastating loss of life at Sutherland Springs, Congress again amended the statute governing the NICS to improve inter-agency reporting. The Fix NICS Act, Pub. L. No. 115-141, Div. S, Title VI (2018), required federal agencies with disqualifying records to submit semiannual certification reports to the Attorney General and develop compliance plans to improve their own performance. *Id.* § 602. Like the earlier amendment, this law also includes measures designed to hold poor performers accountable. First, the law requires that the Attorney General notify Congress of non-compliant agencies and publish a list of those agencies on the DOJ website. Second, the law makes political appointees at non-compliant agencies ineligible for bonus pay until the agency improves. *Id.* § 602(1) (codified at 34 U.S.C. § 40901(e)(1)(F)-(I)).

In the time since the Sutherland Springs shooting, components of the Department of Defense have taken a wide range of actions to correct their deficiencies. Efforts include the creation of new task forces and compliance plans, as well as the development of new technological processes to streamline reporting. *See* J.A. 302-16. For example, the Army has, in recent months, provided new records for nearly 33,000 disqualified persons to the NICS.

B.

The tragic shooting in Sutherland Springs also gave rise to this litigation. The appellants are three municipalities, all of whom use the NICS database to fulfill their requirements under state law. They brought this suit to compel DOD's full reporting of

8

disqualifying information to the Attorney General, as required by the NIAA. Since neither the Brady Act nor the NIAA contemplated a separate cause of action to compel performance with inter-agency reporting obligations, the municipal appellants brought their claim under the general provision of the Administrative Procedure Act that allows an aggrieved party to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (2012).

The district court granted the federal defendants' motion to dismiss this claim, finding that it lacked jurisdiction to hear the case. The court identified two independent jurisdictional defects. First, the district court found that the municipal appellants had failed "to allege[] a cognizable informational injury sufficient to confer standing." J.A. 341. Second, the court held that the cities did not establish "jurisdiction under the APA since they have not alleged a discrete agency action." *Id.* As a consequence of the dismissal, the court also denied the municipal appellants' motion for a preliminary injunction. *Id.* at 348.

This appeal followed. While federal courts must assure themselves that they have jurisdiction before proceeding to the merits, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), both of the infirmities identified by the district court go to the question of jurisdiction. As such, this court can turn to either issue alone to resolve this case. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) ("[T]here is no unyielding jurisdictional hierarchy."). Our review is de novo.

9

## II.

Because this court is not in "the habit of decid[ing] questions of a constitutional nature unless absolutely necessary," we turn first to the statutory question of whether the municipal appellants have established subject matter jurisdiction under the Administrative Procedure Act (APA). *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 857 (4th Cir. 2002) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. concurring)). At the outset, it is important to understand the nature of appellants' claim. Their challenge is not about access to the NICS; it is instead about the quality of the information in that system. By their own submission, each of the appellants accesses the NICS frequently to carry out their obligations under state law. This is thus not a case where appellants have asked for access provided for in the regulations and have been denied. Instead, the municipalities see their existing access to the NICS as an invitation to compel any federal inter-agency legal requirement that may affect the quality of the information they receive. On their view, the APA authorizes a recipient of government information to initiate a private action to compel governmental conduct that might improve that information's accuracy or comprehensiveness. As we explain below, there is simply no basis in the APA's text for such a broad incursion into internal agency management.

## A.

The APA waives the federal government's sovereign immunity for a limited set of suits, brought by "a person suffering legal wrong because of agency action" to obtain relief "other than money damages."   5 U.S.C. § 702. It is well-established that

"[s]overeign immunity is jurisdictional in nature" and "absent a waiver . . . shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Judicial review under the APA, moreover, is limited to "final agency actions." 5 U.S.C. § 704.

As these provisions of the APA make plain, subject matter jurisdiction is lacking if the plaintiff fails to challenge a particular "agency action" that is fit for review. *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004). "The term 'action' as used in the APA is a term of art that does not include all conduct" on the part of the government. *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). *See also Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948) ("The difficulty with the appellant company's position is that the Administrative Procedure Act does not provide review for everything done by an agency."). Instead, the APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

This definition limits the scope of judicial review in two important respects. First, each of the terms that comprise the definition of "agency action" is limited to those acts that are "circumscribed" and "discrete." *Norton v. Southern Utah Wilderness Alliance (SUWA),* 542 U.S. 55, 62 (2004). When challenging agency action—whether it be a particular action or a failure to act altogether—the plaintiff must therefore identify specific and discrete governmental conduct, rather than launch a "broad programmatic attack" on the government's operations. *Id*. at 64. This distinction between discrete acts,

11

which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. We are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, *see Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar. Trade Ass'n*, 389 U.S. 64, 76 (1967), or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so. The Supreme Court's guidance on this point is worth considering in full:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67. The requirement that the challenger identify a discrete act keeps us from entering such a quagmire.

Second, the definition of "agency action" is limited to those governmental acts that "determin[e] rights and obligations." *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 445 (4th Cir. 2014). This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties. To meet this requirement, a party must demonstrate that the challenged act had "an immediate and practical impact," *see Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th

Cir. 2010), or "alter[ed] the legal regime" in which it operates. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). It is not enough for plaintiffs to simply identify a governmental action that ultimately affected them through the "independent responses and choices of third parties," or mere "coercive pressures." *Flue-Cured Tobacco*, 313 F.3d at 859, 861. This requirement applies fully to claims that an agency has failed to act, which is "properly understood as a failure to take an *agency action*." *See Norton*, 542 U.S. at 62. Since "agency actions" must determine rights and obligations, claims to compel an agency to take an action must seek such a determination as well.

These two requirements, which flow directly from the APA's text, apply to all challenges to agency action and accordingly limit judicial review generally. When a plaintiff brings a claim to compel agency action, like the municipal appellants have here, a further limit applies. Under the APA, actions that can be compelled are only those that have been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As the Supreme Court has explained, the text of § 706(1) requires that the plaintiff identify action that is "legally required." *SUWA*, 542 U.S. at 63. Just like the traditional mandamus remedy from which this provision is derived, claims to compel agency action are "limited to enforcement of 'a specific, unequivocal command,'" over which an official has no discretion. *Id.* (quoting *ICC v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932)).

Taken together, the limitations imposed on claims to compel agency action under the APA strike a balance between meaningful judicial review and the needs of effective administration. Review is available only when acts are discrete in character, required by

13

law, and bear on a party's rights and obligations. The result is a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management. *See SUWA*, 542 U.S. at 64-65.

These principles guide our consideration of all claims to compel agency action, regardless of the context. Claims involving government information are no exception. Our court, just like our sister circuits, has had many occasions to consider how the requirements of agency action apply to claims that the government has wrongfully handled the information in its possession. In some cases, the claim is that the government's decision to disseminate information, such as an unfavorable report, was unlawful. *See Invention Submission Corp.*, 357 F.3d at 460; *see also Flue-Cured Tobacco*, 313 F.3d at 859; *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1118 (D.C. Cir. 1988). At other times, the claim was that the government improperly withheld or mishandled personal information. *See, e.g.*, *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 871 (11th Cir. 2009). Informational harms may involve novel facts, but they do not disrupt the legal principles set forth in the APA. *See Golden & Zimmerman, LLC*, 599 F.3d at 431-32 (finding that an agency's "reference guide" was not agency action because it did not "impose new legal requirements"). As these cases aptly demonstrate, a plaintiff's burden remains constant and subject to the above requirements throughout.

B.

Applying these well-established principles to the facts here, it is clear that the municipal appellants have failed to establish subject matter jurisdiction under the APA. Once again, the claim at issue arises from the appellants' permissive use of the NICS, afforded to them by regulation, for purposes explicitly "unrelated to the NICS background checks required by the Brady Act." 28 C.F.R. § 25.6(j). The regulation affords the municipalities only "access to the NICS Index." *Id*. On the view of the municipal appellants, this access, which is not expressly contemplated either by the Brady Act or subsequent legislation, allows a NICS user to reach into the federal government and compel any legal obligations associated with developing the information in the system. Such a broad theory of agency action is untethered from the APA's text and contravenes important limits that Congress has placed on judicial review.

First, the municipal appellants' claim does not challenge a discrete agency action. Instead appellants ask that we "supervise an agency's compliance with [the] broad statutory mandate" of the NIAA. *Murray Energy Corp. v. EPA*, 861 F.3d 529, 537 n.4 (4th Cir. 2017). By appellants' own account, the DOD's failure to provide disqualifying conviction records for former service members is widespread and systemic. The department has admitted as much and is engaged in extensive efforts to increase its compliance. As all parties seem to agree, the road ahead is an arduous one, as DOD attempts to improve on its partial and inconsistent reporting. This is the sort of public policy problem that often requires reallocating resources, developing new administrative

15

systems, and working closely with partners across government. Solving it will likely require expertise in information technology and deep knowledge of how military needs intersect with data collection. In other words, it is exactly the sort of "broad programmatic" undertaking for which the APA has foreclosed judicial review. *See SUWA*, 542 U.S. at 64.

Congress seems to be of the same view. Since the passage of the Brady Act, Congress has on multiple occasions turned its attention to the severe challenge of rampant gun violence. Twice, the legislative responses have been directed squarely at agency compliance with NICS reporting obligations. Congress has included accountability measures, designed to identify delinquent agencies and push them into improving their performance. The most recent effort in this regard singles out executive compensation at these agencies, limiting bonus pay for those who do not improve their outcomes. *See* 34 U.S.C. § 40901(e)(1)(I) (providing that certain "political appointee[s] . . . shall not be eligible for the receipt of bonus pay" until their department improves its compliance). These measures signal that Congress sees this problem as one ripe for legislative oversight and in need of attention by experts in the executive branch. At no point, however, has Congress invited the federal courts into the process. Perhaps cognizant of the judiciary's inability to oversee and manage a complex scheme of inter-agency collaboration, we have appropriately been left on the sideline.

The municipal appellants try to nonetheless force us onto the field by characterizing their broad claim as simply an aggregation of many small claims, each one seeking to compel the individual reports required by the NIAA. On this view, what the

16

cities seek is not programmatic because each specific act that DOD has failed to perform is discrete when considered on its own. But any limit on programmatic assessment would be rendered meaningless if such an argument prevailed. All governmental programs are the aggregation of individual decisions, many of which are required by law. The APA ensures that it is the individual decisions that are assessed as agency action, rather than the whole administrative apparatus.

The municipal appellants are surely correct that ongoing failures to carry out discrete obligations can be subject to review. Government deficiencies do not become non-reviewable simply because they are pervasive. This, however, does nothing to obviate the fact that a discrete action is wholly lacking here. By the appellants' own estimate, full compliance with the NIAA may require DOD to obtain and transmit tens of thousands of records. There is simply no way to achieve such a result without wholesale improvements in the DOD's reporting requirements, which take time and require the expertise of senior civilian and military leaders.

If there were any doubt about the nature of the cities' claim, the requested remedy tells the real story. Their complaint "seeks immediate injunctive relief to compel Defendants to repair this broken system and to cure once and for all the potentially deadly gaps in the NCIC database." J.A. 17. In their prayer for relief, the appellants ask that the DOD, on "a schedule to be set by the Court," "identify all records" in its possession, provide the information contained in those records to the Attorney General, "conduct a thorough review of [its] records and procedures," "submit to the Court for approval a compliance plan," and provide "a monthly report to the Court detailing [its]

17

progress." *Id.* at 35-36. The requested relief would continue "until such time as the Court is satisfied that Defendants have brought themselves into *full compliance* with 34 U.S.C. § 40901." *Id.* at 36 (emphasis added). The APA's discreteness requirement exists to avoid placing the courts in this exact position. As we previously explained, "[t]he obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." *Vill. of Bald Head Island*, 714 F.3d at 194.

Moreover, the municipal appellants have failed to demonstrate that the DOD's reporting requirements in any way determine their rights and obligations. Accordingly, they have not identified an act that can be compelled by this court under § 706(1). *See SUWA*, 542 U.S. at 62 (finding that a failure to act under § 706(1) means "failure to take an *agency action*"). The action challenged in this case is DOD's obligation to provide information only to another agency of the federal government: The Department of Justice. *See* 34 U.S.C. § 40901(e)(1)(C). The regulation permitting local law enforcement agencies to use the NICS refers only to access to the system, not to the particular information provided to the FBI by other federal agencies. The transfer of information between agencies does not, without more, alter the rights and obligations of any party. That is especially true, as here, where outside access to the information is entirely permissive and implicates none of the complaining party's obligations under federal law.

We need not say here that information sharing can never constitute agency action. We simply note that claims to compel an agency to provide information are held to the same standard as any other. In arguing otherwise, the municipal appellants point to a

18

string of cases, all from outside this circuit, holding that the government's alleged misuse of information was reviewable "agency action." Our holding here, however, raises no conflict with these decisions. The cases relied on by the appellants involve claims wholly unlike the one that they have brought. For example, one case involves the government's legal obligations with respect to the plaintiffs' personal medical information, *see Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1078 (9th Cir. 2015) (finding that "the Army [has] a duty to provide notice to prior test subjects of information regarding their well-being"), while another examines the rights of federal employees under the civil service system, *see Hondros v. U.S. Civil Service Comm.*, 720 F.2d 278, 280 (3d Cir. 1983). Each of these cases involved plaintiffs seeking information that was particular to them and their own rights under federal law. As such, they tell us little about how to handle a case, like this one, where the plaintiff seeks wholesale compliance with an entire administrative scheme, based solely on the fact that the government has granted them access to an information system.

## C.

What the municipal appellants are ultimately asking for is a judicial decree making the assistance of the federal government more useful to them than it is now. While their motives for wanting to see improvement to the NICS are laudable, they point to no case suggesting that the APA countenances such an action. And for good reason. If a party could seek review any time the federal government's alleged non-compliance made a government program less useful than it might otherwise be, the possibilities for litigation

would be endless. Followed to its logical conclusion, a recipient of the mail could sue the Postal Service for improper employment practices, alleging that it caused inefficient package deliveries. A disgruntled grant applicant could sue the National Institutes of Health for violations of financial management laws, arguing that with more money in its coffers more grants could be issued. The APA, however, is a creature of Congress; the legislative branch has not put it to this sort of use, and we can discern no workable limits in the appellants' theory.

The implications of the appellants' position are particularly troubling in the context of voluntary information sharing. The federal government has access to a vast amount of data that is of great use both to intergovernmental partners and to those in the private sector. Information stored with the federal government is critical to many areas of public policy, including, for example, homeland security and healthcare. *See, e.g.*, Nat'l Infrastructure Advisory Council, Intelligence Information Sharing: Final Report and Recommendations ES-1 (Jan. 10, 2012) ("Information sharing is perhaps the most important factor in the protection and resilience of critical infrastructure."). The federal government has recently taken steps to make more of its own information accessible to the general public, aware of the innovative potential that such information can unleash. *See* Exec. Order No. 13,642, 78 Fed. Reg. 28,111 (May 9, 2013); *see generally* Data.gov ("The home of the U.S. Government's open data."). If we adopted the all-encompassing definition of "agency action" asserted by the municipal appellants here, each of these efforts to enhance public access would be checked by a fear that greater openness would invite judicial scrutiny of any act that went into developing or disseminating the data.

20

With an agency's eye peeled towards these consequences, it is easy to imagine the federal government pulling back from these salutary efforts, and instead choosing to silo its information.

The adverse consequences of appellants' theory would not just fall on the government's attempt to share information with the public; they would also compromise the dissemination of information within the government itself. A rule that made inter-agency information sharing justiciable by federal courts would undermine the whole gamut of federal activities that require collaboration between agencies, of which military preparedness and anti-terrorism efforts are only a part. Agencies dealing with public health, environment conservation, and disaster response draw on entire bodies of scientific work, and not all of the needed expertise will be located within a single agency or department. To have internal information sharing haunted by the specter of judicial oversight would weaken government operations in innumerable areas, both foreign and domestic, and allow the prospect of litigation to erect barriers when other nations, both our allies and our competitors, proceed unburdened by similar obstacles.

III.

The municipal appellants, like localities all over the country, are tasked with keeping the public safe from horrific acts of violence, which far too often are committed by those with firearms they had no lawful right to possess. The municipalities' efforts to combat these threats are commendable. The APA, however, does not permit their efforts to include judicial supervision of the myriad programmatic workings of the federal

21

government. No matter the asserted virtues of the intended intervention, we are simply not equipped to perform such tasks and have no legal basis for doing so.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*